anticipate additional evidentiary issues prior to trial.

12. **STIPULATIONS OF FACT AND LAW**

**Plaintiff and Defendants stipulate to the following facts and law for purposes of this case <u>only</u>.**

    (a)    **Stipulations of Uncontroverted Facts**

1. Since York Square opened in 1970, it has not played a motion picture day and date with Showcase Orange. Since Showcase North Haven opened in 1988, it has not played a motion picture day and date with either Showcase Orange or York Square.

2. No distributor can lawfully compel an exhibitor to exhibit a distributor's motion picture.

3. Each Defendant distributor is aware that if it chooses to license a motion picture to York Square, neither Showcase Orange nor Showcase North Haven will play that picture simultaneously.

4. Since October 1999, if a picture is licensed at York Square, National Amusements, Inc. ("National Amusements"), has not exhibited that picture at Showcase Orange, Showcase North Haven or Showcase Milford.

5. Licensing a picture to Showcase Orange, Showcase North Haven or York Square results in a temporary exclusive exhibition as among those theatres for that film.

6. In the motion picture industry, the period of time a motion picture is licensed for exhibition at a theatre is often referred to as a "run".

7. When a motion picture is exhibited at a theatre on the same date it is exhibited at another theatre, those theatres are frequently referred to in the motion picture industry as playing the motion picture "day-and-date".

**The Parties to this Litigation**

8. The Plaintiff, Broadway Theatre Corp., hereinafter the "York Square", operates a motion picture theatre known as The York Square on property it leases at 55 Broadway, New Haven, Connecticut.

9. The Plaintiff is referred to in the motion picture industry as an "exhibitor".

10. The Defendants are referred to in the motion picture industry as "distributors".

**The Theatrical Motion Picture Industry**

11. The theatrical motion picture industry includes three separate, and distinct lines of commerce: production, distribution and exhibition. Producers create or acquire motion pictures which distributors license for exhibition in theatres owned and/or operated by exhibitors.

12. Motion pictures are works protected by the Copyright Act. 17 U.S.C. § 106.

13. The reported average cost of motion pictures produced in 2002 by the member companies of the Motion Picture Association of America, Inc. ("MPAA") was approximately $58,800,000.

14. The reported average cost in 2002 of advertising and distributing a domestically released motion picture by member companies of the MPAA was $30,620,000.

15. The average reported total investment by member companies of the MPAA in 2002 to produce, distribute and advertise a domestically released motion picture was $89,420,000 per picture.

16. People who negotiate or deal with distributors on behalf of an exhibitor for the licensing of motion pictures with an exhibitor are known in the motion picture industry as "film buyers" or "agents."

17. Exhibitors of a motion picture, or their film buyers, regularly report information concerning box office receipts generated by the exhibition of a motion picture at a theatre to the distributor of the motion picture.

18. AC Nielsen EDI ("EDI") is an organization that collects box office data from the majority of exhibitors and disseminates certain information concerning the exhibition of motion pictures, including box office revenues generated from the exhibition of motion pictures at many theatres throughout the United States.

19. EDI collects data from exhibitors relating to box office revenues generated by the exhibition of a motion picture at, inter alia, Showcase Orange, Showcase North Haven, Showcase Milford, York Square, Hoyts Branford and Entertainment Cinemas, Seymour.

20. Hoyts Branford is now known as the Regal Cinemas, Branford Stadium 12.

21. Information concerning box office receipts generated by a theatre in the exhibition of a motion picture permits comparison of the box office grosses of different theatres exhibiting the same film.

22. National Amusements owns and operates the "Showcase Orange" theatre located in Orange, Connecticut, just off Interstate 95 at Exit 41, and the "Showcase North Haven" theatre located in North Haven, Connecticut, just off Interstate 91 at Exit 9.

23. National Amusements owns and operates the "Showcase Milford" theatre located in Milford, Connecticut, just off Interstate 95 at Exit 39.

24. Exhibit 7, filed in support of Defendants' Motion for Summary Judgment, is a true and accurate copy of information provided on Plaintiff's website, as of the date of print.

25. Joseph Soffer is an exhibitor who owns and operates Cine 1-2-3-4, a four-screen motion picture theatre located in New Haven, Connecticut.

26. Arnold Gorlich operates the Madison Art Cinemas, a two-screen motion picture theatre located in Madison, Connecticut.

27. Hoyts Branford (Regal Cinemas, Branford Stadium 12) is a twelve-screen theatre located in Branford, Connecticut, off Interstate 95 at Exit 55.

**Showcase Orange, York Square, Cine 1-2-3-4, and Showcase North Haven**

<u>**The Showcase Orange**</u>

28. National Amusements opened the Showcase Orange in 1968 in Orange, Connecticut, just off Interstate 95 at Exit 41.

29. Between 1986 and July 1, 1994, Showcase Orange had seven auditoriums, with a seating capacity of 336, 479, 486, 495, 535, 536 and 567.

30. In 1994, the Showcase Orange relocated to a new theatre facility across Interstate 95 with eight auditoriums, with a seating capacity of 364, 593, 313, 605, 313, 605, 456 and 313.

31. The Showcase Orange has dedicated parking for 1178 vehicles.

32. The distance from Showcase Orange to York Square using Interstate 95 and following the directions provided by York Square on its website, is 7.5 miles.

33. Motion pictures exhibited at Showcase Orange are listed and/or advertised daily in the <u>New Haven Register</u>, <u>The Advocate</u> and the <u>Connecticut Post</u>.

34. Since the opening of Showcase Orange, York Square and Showcase Orange have never exhibited a motion picture simultaneously ("day-and-date") with each other.

**<u>The York Square</u>**

35. The Plaintiff opened York Square on December 22, 1970.

36. The York Square opened with one auditorium with a seating capacity of approximately 550.

37. In 1985, the Plaintiff converted the 550 seat auditorium into two auditoriums, Cinemas 1 and 2, each with a seating capacity of just under 250.

38. In 1985, the Plaintiff leased additional property contiguous to the theatre and constructed a third auditorium to the York Square, Cinema 3, with a seating capacity of 221.

39. The interior lobby of York Square has a capacity of up to 100 people.

40. The York Square has one concession stand which is 10 to 12 feet long. Patrons purchase their tickets at an area located at the beginning of the concession stand.

41. There is no parking lot designated for patrons of York Square. However, from 6:30 p.m., unlimited evening parking is available to patrons in the municipal lot located across the street from the theatre for one dollar.

42. Motion pictures exhibited at York Square are listed and /or advertised daily in the New Haven Register, the Yale Daily News, the Connecticut Post and the Hartford Courant, and weekly in The Advocate and The Yale Herald.

43. Since York Square opened, it has never exhibited a motion picture simultaneously ("day-and-date") with Showcase Orange or Showcase North Haven.

**Cine 1-2-3-4**

44. The distance from Cine 1-2-3-4 to The York Square is 4.9 miles.

45. Motion pictures exhibited at Cine 1-2-3-4 are listed and/or advertised daily in the New Haven Register, the Connecticut Post and the Hartford Courant, and weekly in The Advocate.

46. Since it opened in 1971, Cine has never exhibited a motion picture day-and-date with Showcase Orange.

**Showcase North Haven**

47. National Amusements opened the Showcase North Haven in July 1988 in North Haven, Connecticut, just off Interstate 91, at Exit 9.

37

48. Between 1988 and December 1999, the Showcase North Haven had eight auditoriums, with seating capacities of 358, 490, 210, 210, 210, 210, 490 and 358, respectively.

49. In December 1999, Showcase North Haven added two auditoriums, each having 293 seats.

50. In January 2000, Showcase North Haven added another two auditoriums, each having 293 seats.

51. Beginning October 1998 and ending May 2000, the original eight auditoriums were retrofitted with a stadium seating style design and the original eight screens now have seating capacities of: 264, 300, 132, 130, 132, 130, 296 and 264, respectively.

52. The Showcase North Haven has a dedicated parking lot for 1650 vehicles.

53. The distance from Showcase North Haven to York Square is 6.8 miles.

54. Motion pictures exhibited at Showcase North Haven are listed and/or advertised daily in the New Haven Register and the Hartford Courant, and weekly in The Advocate.

55. Since it opened in 1988, Showcase North Haven has never exhibited a motion picture day-and-date with York Square or Showcase Orange.

**Lesser Theatre Service and Robert C. Lawinski**

56. In the early 1990s, Lesser Theatre Service was retained by Joseph Soffer to be the booker or film buyer for Cine 1-2-3-4.

57. Robert C. Lawinski was the Lesser Theatre Service employee most responsible for the day-to-day booking of films for Cine 1-2-3-4.

58. In March 1999, Lesser Theatre Service was retained by Plaintiff to be the booker or film buyer for York Square.

59. In January 2000, Lesser Theater Service ceased to be the booker for Cine 1-2-3-4.

60. Since March 26, 1999, Robert C. Lawinski of Lesser Theatre Service has been the film buyer for York Square and is the person most responsible for the day-to-day booking of films for York Square.

**Prior Litigation Pertaining to Licensing of Motion Pictures in the New Haven Area**

61. In August 1991, Joseph Soffer, d/b/a Cine 1-2-3-4 instituted a lawsuit ("the Soffer case") against National Amusements, Inc., and several distributors of motion pictures, many but not all of which are Defendants in this case, alleging that National Amusements, Inc. and the distributor Defendants violated the Connecticut Antitrust Act in their licensing of motion pictures in the New Haven area. The Soffer case was litigated in the United States District Court for the District of Connecticut and was encaptioned <u>Joseph Soffer, d/b/a Cine 1-2-3-4 v. National Amusements, Inc., et al.</u>

    **(b)    Contested Issues of Fact**

Facts proposed by Defendants, but not accepted as stipulations by Plaintiff are enumerated in section 13 (a) below, under Defendants' Proposed Findings of Fact.

    **(c)    The Parties' Stipulations of Law**

1. The "cigarette rule" is used to determine whether a particular act or practice is

unfair in violation of CUTPA: "(1) [w]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law or otherwise – whether, in other words, it is within at least the penumbra of some common law, statutory, or other concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or businessmen." McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984); Rudel Machinery Co., Inc. v. Giddings & Lewis, Inc., 68 F.Supp. 2d 118, 129 (D.Conn. 1999).

2. To establish substantial injury under CUTPA, Plaintiff must prove that: (1) the injury is substantial; (2) it is not outweighed by countervailing benefits to consumers or competition that the practice produces; and (3) it is an injury that consumers could not reasonably avoid. See McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558, 567-68, 473 A.2d 1185 (1984); Williams Ford, Inc. v. Hartford Courant Co., 232 Conn. 559, 592, 657 A.2d 212 (1995) (This test is equally applicable where a business person or competitor claims substantial injury.).

3. "All three [prongs of the cigarette rule test] do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Jacobs v. Healey Ford-Subaru, Inc., 231 Conn. 707, 725-26, 652 A.2d 496 (1995).

(d)     **Contested Issues of Law**

Issues of law proposed by Defendants, but not agreed to by Plaintiff are enumerated in section 13 (b) below, under Defendants' Proposed Conclusions of Law.

13.    **PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

*Plaintiff's Proposed Findings of Fact and Conclusions of Law:*

(a)     **Plaintiff's Proposed Findings of Fact**

Plaintiff submits no proposed findings of fact.

(b)     **Plaintiff's Proposed Conclusions of Law**

Plaintiff includes, by reference, all exhibits and declaration in its opposition to defendants Motion for Summary Judgment.

1. The Connecticut Unfair Trade Practices Act ("CUTPA") prohibits "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce," Conn. Gen. Stat. § 42-110b. The "Cigarette Rule" establishes three criteria to determine whether a practice is unfair or deceptive. United States v. Paramount, 334 U.S. 131 (1948) establishes that "there should be no clearances between theatres not in substantial competition." Id. at 146. Clearances must have "relation to the competitive factors alone which" can justify them. Id. at 146. Clearances may not have "a fixed and uniform character… without regard to the special circumstances which are necessary to sustain them…." Where the Defendants "either participated in evolving this uniform system of clearances or acquiesced in it and so furthered its existence" they have participated in the "unfair or deceptive acts or practices" which CUTPA forbids.

41