Further, regarding clearances, "to place on the distributor the burden of showing their reasonableness is to place it on the one party in the best position to evaluate their competitive effects." Id. at 148.

2. This court accepted as a second "CUTPA" count retaliatory practices engaged in by defendants Sony/Columbia, Universal and Dreamworks. Specifically, the cited Defendants refused to license for exhibition any of their distributed films to Plaintiff from approximately the date of the filing of Plaintiff's Complaint. Plaintiff stipulated that this retaliatory conduct offends all three branches of the "Cigarette" Rule, and is properly before this court as violative of CUTPA. CUTPA is offended by the Defendants' Contracting Procedure.

3. In Plaintiff's "Opposition to Defendants' Motion for Summary Judgment," Plaintiff noted CUTPA violations in the licensing contracting procedure, where most Defendants, as a condition of a "Master License" or "Master Agreement" agree to maintain written records of clearances and their terms. In discovery, no Defendant distributor produced such records. The sham process deceives the exhibitor who agrees to the "master" terms into believing that clearances are part of an agreed contracting process. The deception is a fraud upon the exhibitor who has agreed, by the Master Agreement, to be bound by its terms and resulting clearance restriction. Plaintiff stipulates that all three legs of CUTPA are offended by Defendants' contracting practice.

Defendants' film licensing practices restricting the exhibition opportunities of the Plaintiff's York Square Cinema are unjustified and violative of any CUTPA

standard. The Defendants contracting process, traditional granting of clearance licenses and retaliatory conduct offend every cited CUTPA standard. Their practices harm consumers, the Plaintiff, competitors and other business persons. The harm to these people and entities extend far beyond the Plaintiff cinema; indeed, under the statute, this complaint could have been brought by any consumer – New Havener who felt aggrieved, or any business person who has suffered because his opportunities have become less. Defendants' unfair, immoral practices certainly cause substantial injury far beyond that suffered by the Plaintiff. The offense to "Public Policy," to "Established Concept(s) by fairness, resonates through the urban infrastructure. The urban mother with children, but no automobile, is deprived of the suburban pleasure which the suburbs take for granted. Because of Defendants' "unscrupulous, immoral" practices, their lives are less. The wheelchair bound city citizens who are unable to participate in cinematic commerce lives a life which is "less". One cannot wheel to the suburbs. Their lives are "less." The harm extends to all Downtown New Haveners. The Defendants' retaliatory "boycott" of the York Square harms the affected groups ever further. With no gain whatsoever to the Defendants, the urban cinematic "commercial" choices become even less. If there was, as Defendants' contend, no harm before the boycott, there certainly has been in the 3 ½ ensuing years. The Defendants have again demonstrated "immoral, unethical, oppressive or unscrupulous" practices. They are not engaging in "competition," merely an aggressively "unfair" offense to "CUTPA." The Defendants are not acting in any

43

way which achieves commercial purpose or increased profit.

The Defendants' described sham contracting process deprives the non-defendant contracting entity of any opportunity to achieve a fair contract. Fairness is promised and contracted for, as an inducement, but not present. Only by filing suit does the harmed, restricted exhibitor, like the Plaintiff, achieve awareness that the Defendants have participated in a fraudulent sham.

The conclusion, as a matter of law, is that Defendants' have engaged in "unfair or deceptive practices in the conduct of trade or commerce."

***Defendants' Proposed Findings of Fact and Conclusions of Law:***

(a)     **Defendants' Proposed Findings of Fact**

**Theatrical Motion Picture Industry**

1. Prior to release, each distributor formulates a separate and unique domestic distribution plan for the licensing of a motion picture. A distributor tries to determine the optimal number and choice of markets, and the number of theatres therein most likely to stimulate and satisfy public interest in a motion picture and to maximize revenue from the picture. See generally Defendant Declarations filed in support of Defendants' Summary Judgment papers.

2. A distribution plan for a motion picture will vary depending upon the number of markets in which the distributor decides to release the picture, the number of prints of the distributor decides to make, the number of theatres the distributor decides to license within a given area, the film's genre, and the cost of prints,

advertising and shipping. See generally Defendant Declarations, filed in support of Defendants' Summary Judgment papers.

3. Multiple runs of the same film in the same market can dilute the film rental, increase expenses and negatively impact the public perception or viewing experience of the film in that market.

4. A distributor seeks to license its motion pictures to the particular theatres within each market likely to produce the highest gross box office receipts in an effort to maximize revenues in that market. See generally Defendant Declarations filed in support of Defendants' Summary Judgment papers.

5. Each time a distributor releases a motion picture, it competes with all other motion pictures offered by all other distributors, for exhibition on the most desirable screens at the most desirable theatres in each market for that film. See, e.g., Chicago Ridge Theater L.P., 732 F.Supp. at 1506.

6. Information collected and disseminated by EDI concerning box office revenue is one source routinely relied upon by motion picture distributors in evaluating the relative grossing power and potential of motion picture theatres, and in making subsequent decisions regarding the licensing of motion pictures. See generally Defendant Declarations filed in support of Defendants' Summary Judgment papers.

7. A "clearance" is a contractual term that may be included in a license at the request of an exhibitor, which "precludes distributors from licensing other theatres, either specifically named or encompassed in a named geographic area, from showing a

movie while it is being exhibited by the theater" which requested it. <u>Theee Movies of Tarzana v. Pacific Theatres, Inc.</u>, 828 F.2d 1395, 1397 (9th Cir. 1987), <u>cert. denied</u>, 484 U.S. 1066 (1988).

**Licensing of Motion Pictures in the New Haven Area**

8. Each motion picture, by reason of its stars, story, director and numerous other factors, is unique and has its own special appeal to particular segments of the public. The distribution plan is tailored specifically for each film and thus varies from film to film. <u>See</u> <u>generally</u> Defendant Declarations filed in support of Defendants' Summary Judgment papers.

9. The goal of each distribution plan is to maximize revenues from box office receipts earned from the exhibition of the motion picture. <u>See</u> <u>generally</u> Defendant Declarations filed in support of Defendants' Summary Judgment papers.

10. Box office revenue for motion pictures exhibited at York Square rarely, if ever, reaches the national box office average per engagement for that film. <u>See</u> Khurana Dec. at ¶ 19.

11. Box office revenue generated from the exhibition of motion pictures at Showcase Orange and Showcase North Haven frequently exceeds the national average box office per engagement for the film. <u>See</u> Khurana Dec. at ¶ 20.

12. Up until the latter part of the 1990s, some distributors licensed some motion pictures in the New Haven area, and elsewhere, through a process of bidding. Bids often requested a clearance over other theatres which drew patrons from the same population area as the exhibitor submitting the bid. Motion pictures are

primarily licensed through direct negotiations between a distributor and an exhibitor. See Lawinski Depo. at 83-85.

**The York Square**

13. When Leonard Sampson and Robert Spodick come to New Haven, their interest was to establish New Haven as a center of foreign and independent film. York Square has, and continues, to serve that end. See York Square website, http://www.yorksquare.com; see also Exhibit 3 to Spodick Depo.

14. From 1998 to 2002, York Square exhibited 131 different films on a first run basis, many from Defendant Distributors. See Report of George L. Priest at ¶ 28; see also Defendant Declarations.

15. The projection equipment used in Cinema 1 of York Square is the same projection equipment purchased in 1970 when the theatre opened. See Spodick Depo. at 70, ll. 3-10.

16. The projection equipment used in Cinema 2 of York Square is the same projection equipment purchased when Cinema 2 opened in 1985. See Spodick Depo. at 70-71.

17. The projection equipment used in Cinema 3 of York Square is the same projection equipment purchased when Cinema 3 opened in the late 1980s. See Spodick Depo. at 71.

18. The seats used in Cinema 1 and Cinema 2 of York Square are the same seats purchased in 1970 when the theatre opened in 1970. The seats used in Cinema 3 of York Square are factory-rebuilt seats. None of the seats are modern rocker

seats nor do they have holders for beverages. See Spodick Depo. at 71, ll. 14-24, 72, ll. 4-7.

19. The sound equipment in Cinema 1 and Cinema 2 is the original sound equipment purchased in 1970 when the theatre opened. See Spodick Depo. at 70, ll. 5-24.

20. The sound equipment used for Cinema 3 is the same type of sound equipment used in Cinema 1 and Cinema 2. See Spodick Depo. at 71, ll. 3-13.

**Competition Among New Haven Area Exhibitors**

21. An analysis of box office grosses generated by the exhibition of first run releases of motion pictures at York Square with box office grosses generated by the exhibition of first run releases at Showcase Orange and Showcase North Haven demonstrates the superior ability of Showcase Orange and Showcase North Haven to generate box office grosses that frequently exceed the national per engagement average.

22. York Square, Showcase Orange and Showcase North Haven serve the same geographic market. See Report of George L. Priest at ¶ 24.

23. York Square, Showcase North Haven and Showcase Orange compete for the Yale-affiliated audience. See Report of George L. Priest at ¶ 25.

24. A substantial portion of the urban downtown New Haven population attends Showcase North Haven, Showcase Orange and York Square. See Report of George L. Priest at 9-10; see also "A Survey of Moviegoers in the New Haven Area", conducted by Professor Eugene P. Ericksen of the National Economic Research Associates (NERA) (hereafter "Ericksen Survey") at Table 2.

25. Prior to the filing of this lawsuit, Plaintiff undertook a survey of York Square patrons that provided information concerning patrons who were coming to York Square from areas other than Downtown New Haven as defined by the Plaintiff. See Spodick Depo. at 76, ll. 17–24; 77, ll. 1-11.

26. The York Square survey indicated that approximately 50 % of York Square patrons were from zip codes outside central New Haven. See Spodick Depo. at 76, ll. 17–24; 77, ll. 1-11.

27. If York Square were to exhibit a popular motion picture such as Men of Honor exclusively in the New Haven area, it would draw patrons from the towns of Bethany, Branford, East Haven, Hamden, New Haven, North Branford, North Haven, Orange, West Haven, and Woodbridge. See Spodick Depo. at 81, ll. 4–24; 82, ll. 1-7; 228, ll. 16-21.

28. If Showcase Orange were to exhibit a popular motion picture such as Men of Honor exclusively in the New Haven area, it would draw patrons from the towns of Bethany, Branford, East Haven, Hamden, New Haven, North Branford, North Haven, Orange, West Haven, and Woodbridge. See Spodick Depo. at 228, ll.22-24; 229, ll. 1-20.

29. If Showcase North Haven were to exhibit a popular motion picture such as Men of Honor exclusively in the New Haven area, it would draw patrons from the towns of Bethany, Branford, East Haven, Hamden, New Haven, North Branford, North Haven, Orange, West Haven, and Woodbridge. See Spodick Depo. at 228, ll. 22-24; 229, ll. 1-20.

30. When Lesser Theater Service booked motion pictures for Cine 1-2-3-4 in the 1990s, it requested a clearance over Showcase North Haven and York Square on numerous occasions. See Lawinski Depo. at 62, ll. 19-25; 63, ll. 1-8.

**Prior Litigation Pertaining to Licensing of Motion Pictures in the New Haven Area**

31. In June 1996, Judge Covello granted summary judgment for the Defendants finding that Soffer was unable to establish that granting clearance to Showcase Orange over Cine (which is farther from Showcase Orange than is York Square) was an anti-competitive business practice. See Soffer, 1996 WL 194947 at *6-7.

**Defendants' Licensing Practices in the New Haven Area**

32. Distributors licensing practices in the New Haven area increases the overall number of different motion pictures being exhibited in the area and enhances consumer choice. See Soffer, 1996 WL 194947 at *5-6.

33. One of the material factors each Defendant considers in making its licensing decisions is the "grossing history" of the competing theatres and their box office revenue potential with respect to the specific motion picture at issue. See generally Defendant Declarations.

34. Each Defendant makes its licensing decisions independently of all other distributors, on a picture-by-picture basis, with the objective of having each motion picture exhibited at a theatre or theatres with the greatest potential for maximizing individual revenues. See generally Defendant Declarations.

35. Each Defendant's business practices reflect valid unilateral good faith business judgments made in its independent business interest.

36. The Defendants' business practices result in a temporary exclusive right to the licensed theatre, which is permitted by virtue of statutory rights conferred under the Copyright Act, 17 U.S.C. § 106, and promotes the public policies of robust competition and protecting holders of copyrighted material.

37. The evidence submitted on Plaintiff's damages claims does not afford a sufficient basis for estimating their amount with reasonable certainty, and is not "substantial" under CUTPA.

38. Plaintiff's loss, if any, is outweighed by continuing, countervailing benefits to consumers arising from increased interbrand competition.

39. Plaintiff's injury, if any, is of its own making, and results from its unwillingness or inability to invest in its theatre. Plaintiff has failed to invest sufficient resources to upgrade its theatre to become more competitive with the other highly successful exhibitors in the New Haven area.

40. There is no evidence that Defendants were recklessly indifferent to Plaintiff's rights or intentionally and wantonly violated those rights.

    **(b)    Defendants' Proposed Conclusions of Law**

1. The Plaintiff's single count Complaint is governed by the three-year statute of limitations in Connecticut General Statutes § 42-110g(f).

2. Granting a clearance to an exhibitor in substantial competition with another exhibitor, or exercising unilateral business judgment in licensing a picture to Showcase Orange, Showcase North Haven or York Square, which results in a temporary exclusive right to the licensed theatre, conforms to approved standards