# Tab B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BROADWAY THEATRE CORP. | ) | |
| | ) | |
| | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO: 300-CV-00706 (SRU) |
| | ) | |
| | ) | |
| | ) | |
| BUENA VISTA PICTURES | ) | **DECLARATION OF RICHARD W.** |
| DISTRIBUTION, COLUMBIA | ) | **BOWERMAN IN SUPPORT OF** |
| PICTURES INDUSTRIES, INC., | ) | **DEFENDANT LIONS GATE FILMS** |
| DREAMWORKS DISTRIBUTION L.L.C., | ) | **INC.'S MOTION IN LIMINE** |
| LIONS GATE FILMS INC., | ) | |
| METRO-GOLDWYN-MAYER | ) | |
| DISTRIBUTION CO., MIRAMAX FILM | ) | |
| CORP., NEW LINE CINEMA | ) | |
| CORPORATION, PARAMOUNT | ) | |
| PICTURES CORPORATION, SONY | ) | |
| PICTURES RELEASING | ) | |
| CORPORATION, UNIVERSAL FILM | ) | |
| EXCHANGES, INC., WARNER BROS. | ) | |
| DISTRIBUTING, AND USA FILMS, LLC | ) | MARCH 29, 2004 |

## DECLARATION OF RICHARD W. BOWERMAN

I, Richard W. Bowerman, hereby declare as follows:

1.    I am a partner of the law firm of Tyler Cooper & Alcorn, LLP, counsel of record for

all defendants in this action, including Lions Gate Films Inc. ("Lions Gate"). I make

this declaration based on my personal knowledge in support of the motion in limine

filed by Lions Gate.

2.    Attached hereto and made a part hereof are true and correct copies of selected pages
      of the transcript of the deposition in this action of Robert Spodick, the President of
      plaintiff Broadway Theatres Corporation.

      I declare under penalty of perjury under the laws of the United States of America that
      the foregoing is true and correct.


      Executed in New Haven, Connecticut this 29th day of March 2004.


                                    Richard W. Bowerman

2

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

------------------------------x

BROADWAY THEATRE CORP.,              :

        Plaintiff,              :

    -versus-                    :   Civil Action
                          300-CV-00706
BUENA VISTA PICTURES            :   Volume III
DISTRIBUTION, et al,

                      :

        Defendants.              :

------------------------------x

Continued deposition of ROBERT SPODICK, SR.,

taken pursuant to the Federal Rules of Civil

Procedure, at the law offices of TYLER COOPER &

ALCORN, 205 Church Street, New Haven, Connecticut,

before Lorraine Calegari, a Licensed Shorthand

Reporter and a Notary Public in and for the State

of Connecticut, on Thursday, December 14, 2000 at

11:05 a.m.

MORGILLO & FLYNN, L.L.C.

A P P E A R A N C E S:

FOR THE PLAINTIFF:

PETER SPODICK, ESQUIRE
592 Central Avenue
New Haven, Connecticut 06515

FOR THE DEFENDANT:

TYLER COOPER & ALCORN
205 Church Street
New Haven, Connecticut 06509-1910

BY:   RICHARD BOWERMAN, Esq., of Counsel

        and

      SARGOY STEIN, ROSEN & SHAPIRO
      1790 Broadway
      New York, New York 10019-1412

      BY:   JEFFREY A. ROSEN, Esq., of Counsel

A L S O   P R E S E N T:

Kimberly Hoover

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND
AGREED by and between counsel for the
respective parties hereto that all
technicalities as to proof of the official
character before whom the deposition is to
be taken are waived.

IT IS FURTHER STIPULATED AND
AGREED by and between counsel for the
respective parties hereto that the reading
and signing of the deposition by the
deponent are waived.

IT IS FURTHER STIPULATED AND
AGREED by and between counsel for the
respective parties hereto that all
objections, except as to form, are reserved
to the time of trial.

\* \* \* \* \* \*

MORGILLO & FLYNN, L.L.C.

```
1       ROBERT SPODICK, SR.,

2               called as a witness, having been first

3               duly sworn by Lorraine Calegari, a

4               Licensed Court Reporter and Notary

5               Public in and for the State of

6               Connecticut, was examined and

7               testified as follows:

8       CONTINUED DIRECT EXAMINATION

9       BY MR. BOWERMAN:

10          Q.   Mr. Spodick, we're here for day three of

11      your deposition.  And again, the same general

12      rules will apply with regard to my questioning.

13              You are under oath, and please answer

14      each question audibly as opposed to nodding of

15      your head, so the reporter will be able to

16      accurately get down your response.

17              If at any time you don't understand the

18      question, let me know.  If you answer, I'll assume

19      you understood.  Fair enough?

20          A.   Yes.

21          Q.   Okay.

22          A.   I do have one comment before you go on.

23          Q.   All right.

24          A.   I was provided this copy last week.
```

MORGILLO & FLYNN, L.L.C.

1          A.    That's right.

2          Q.    And in screen 3, the system is referred

3     to as what?

4          A.    Two projectors.

5          Q.    Okay.  And on approximately how many

6     occasions during any given year would you use the

7     16 millimeter?

8          A.    Two, three, maybe four, that's all.

9          Q.    Two or three or four?

10         A.    Occasions.

11         Q.    Okay.

12                    (Defendant's exhibit for

13     identification marked No. 11:  Letter dated

14     November 2, 2000.)

15     BY MR. BOWERMAN:

16         Q.    When did you take your trip to China;

17     November sometime, wasn't it?

18         A.    November 11th through 28th.

19         Q.    Okay.  Mr. Spodick, I'm going to show

20     you what's been marked as Defendant's Exhibit 11.

21     Can you identify that for the record?

22         A.    Yes.

23         Q.    Is that a letter that you sent dated

24     November 2, 2000?

1       A.     Yes.

2              Q.     To whom was that letter addressed?

3       A.     Lion's Gate pictures.

4              Q.     To Mr. Tom Orenberg?

5       A.     Yes.

6              Q.     And do you know Mr. Orenberg?

7       A.     No, I don't know him.

8              Q.     Have you ever communicated, ever had any

9       telephone conversations or oral conversations with

10      Mr. Orenberg?

11      A.     Not to my recollection.

12             Q.     Other than this letter, have you ever

13      communicated to Mr. Orenberg?

14      A.     I don't recall.  I don't believe so.

15             MR. SPODICK:  Pardon me, if I may.

16      I think you should take an opportunity to review

17      the document before you comment on it.  I think if

18      you need a minute or two, you should ask for it.

19      BY MR. BOWERMAN:

20             Q.     Do you want to take a minute or two to

21      read this letter?

22      A.     May I read this more carefully?

23             Q.     You certainly may.  Take a few minutes.

24      A.     (Pause).

MORGILLO & FLYNN, L.L.C.

1      Q.   Have you had an opportunity to review

2    Defendant's 11, Mr. Spodick?

3      A.   Yes.  Briefly, may I have one moment to

4    ask a question to my counsel?

5      Q.   Sure.

6                (Discussion off the record.)

7    BY MR. BOWERMAN:

8      A.   I have the Orenberg letter.

9      Q.   You begin that correspondence to Mr.

10   Orenberg saying that you were speaking to Rob

11   Lawinski of Lesser Theater Service, who suggested

12   that you communicate with Mr. Orenberg.  You see

13   that in your first paragraph?

14     A.   Yes.

15     Q.   When were you speaking with Mr.

16   Lawinski?

17     A.   Prior to November 2nd.

18     Q.   And what was Mr. Lawinski telling you

19   with regard to suggesting that you communicate

20   with Mr. Orenberg?

21     A.   He thought it might be beneficial to

22   give him the history of our relationship and of

23   the present state of our attitude.

24     Q.   What prompted Mr. Lawinski to say that

MORGILLO & FLYNN, L.L.C.

1    to you?  What was the conversation between you and

2    Mr. Lawinski which gave rise to this?

3        A.    He thought Mr. Orenberg might be

4    interested to hear directly from the theater.

5        Q.    Did Mr. Lawinski tell you that he had

6    spoken with Mr. Orenberg?

7        A.    I recall that he referred to previous

8    conversations.

9        Q.    And what did Mr. Lawinski tell you with

10   regard to Mr. Lawinski's previous conversations

11   with Mr. Orenberg?

12       A.    That he thought it might be useful for

13   us to contact him directly, which we proceeded to

14   do.

15       Q.    And that was through this letter, which

16   is Defendant's Exhibit 11, correct?

17       A.    Yes.

18       Q.    Your letter goes on to indicate that we

19   have been your faithful customer, and that

20   means -- are you referring to York Square Cinemas

21   that's been a faithful customer of Lion's Gate

22   pictures?

23       A.    Yes.

24       Q.    I take it prior to November 2000 York

1    Square Cinemas would exhibit films distributed to

2    you by Lions Gate pictures; is that correct?

3        A.    Some, but not all, yes.

4        Q.    Can you make reference or recall what

5    Lion's Gate films would be exhibited or have been

6    exhibited at York Square Cinemas?

7        A.    I can't give you that list offhand.

8        Q.    It refers essentially to the concept

9    that: We have had a relationship of playing most

10   of the films released by Lion's Gate and have

11   considered ourselves to be their customer in the

12   expectation that while we did play films that

13   looked to have a very limited audience appeal and

14   likely would be what we would otherwise call a

15   looser engagement, that in the course of time

16   these were to even out to a good and profitable

17   relationship with other names that would come

18   along to be more substantially successful.

19       A.    This is what prompted this letter, by

20   their practice of departing from having us be

21   their account in the case of the potentially

22   strong film called American Psycho.

23       Q.    So if I understand your testimony, for

24   some period of time Lion's Gate had distributed

MORGILLO & FLYNN, L.L.C.

1    motion pictures to your exhibition at York Square

2    Cinemas; is that correct?

3         A.   Yes.

4         Q.   Do you know approximately what period of

5    time you're making reference to?

6         A.   I can't be specific, but I would say

7    five or six years.

8         Q.   Okay.  So over a five or six-year period

9    Lion's Gate had licensed to York Square Cinemas

10   motion pictures for exhibition?

11        A.   Yes.

12        Q.   Do you know whether those motion

13   pictures were licensed to York Square Cinemas for

14   exhibition first run?  Were they first run films?

15        A.   Yes.  These were from Lion's Gate, and I

16   might add it's predecessor companies, pleural.

17        Q.   What is the predecessor's name?

18        A.   I think the initials CFP, meaning

19   Canadian Film Program or Properties, and something

20   else.  I don't remember.

21        Q.   Okay.

22        A.   Lion's Gate is a Canadian film financing

23   outfit.

24        Q.   And the films that Lion's Gate or its

MORGILLO & FLYNN, L.L.C.

1    predecessor company or companies had licensed to

2    York Square Cinemas, they were first run films and

3    that had gone on for some four or five years prior

4    to November 2000; is that correct?

5         A.    Yes.

6         Q.    The films that Lion's Gate or its

7    predecessor companies had licensed to York Square

8    Cinemas, were they licensed to York Square Cinemas

9    for exhibition in the New Haven area exclusively

10   to York Square Cinemas?

11        A.    I don't know about the technical license

12   agreement, which I never saw.  We were the only

13   theater which showed these films, so in that

14   respect I dare say the assumption exclusive is

15   correct.

16        Q.    Okay.

17        A.    By the way, I would amend the answer to

18   suggest that the relationship existed for more

19   than ten years.

20        Q.    So you amend your answer with regard to

21   the time period of a relationship with Lion's Gate

22   pictures or its predecessor companies to have been

23   some ten years?

24        A.    Yes.

MORGILLO & FLYNN, L.L.C.

1          Q.   Prior to November 2000; is that correct?

2          A.   Yes.

3          Q.   And during that period the first run

4     motion pictures that were licensed to York Square

5     within the area depicted in Defendant's 5, York

6     Square was the only theater depicted in that

7     exhibit that was exhibiting those films; is that

8     correct?

9          A.   Yes, I think so.

10         Q.   And did there come a time when Lion's

11    Gate licensed motion pictures in the New Haven

12    area first run to a theater other than York Square

13    Cinemas?

14         A.   As I recall, yes, in the instance of

15    American Psycho.

16         Q.   And indeed, American Psycho is

17    referenced in your letter to Mr. Orenberg; is that

18    correct?

19         A.   Yes.

20         Q.   American Psycho was a picture

21    distributed by Lion's Gate pictures; is that

22    correct?

23         A.   Yes.

24         Q.   And was that a first run film when it

MORGILLO & FLYNN, L.L.C.

1    was offered for exhibition in the New Haven area?

2    Was it offered for exhibition first run in the New

3    Haven area?

4        A.    I don't know.

5        Q.    Do you know if it was exhibited in the

6    New Haven area?

7        A.    Yes.

8        Q.    Do you know where it was exhibited first

9    run in the New Haven area?

10       A.    Yes, I believe it was at Showcase

11   Orange.

12       Q.    How did you become aware of that?

13       A.    By learning, one, that a film buyer

14   informed us that it was scheduled; and, two, that

15   that was confirmed by advertisements in the local

16   newspaper.

17       Q.    When was American Psycho made available

18   for exhibition in the New Haven area?

19       A.    I believe in the spring of 2000; I don't

20   know the date.

21       Q.    Was that the first motion picture

22   offered for licensing by Lion's Gate in the New

23   Haven area which was not offered to York Square

24   Cinemas?

MORGILLO & FLYNN, L.L.C.

1          A.    I believe so.  I am not certain.

2          Q.    And is that what prompted this

3    communication, Defendant's Exhibit 11?

4          A.    Yes.

5          Q.    The fact that American Psycho was not

6    offered to York Square Cinemas first run in the

7    New Haven area, but it was offered to Showcase

8    Orange, is that correct?  Is that what prompted

9    this communication to Mr. Orenberg?

10         A.    Yes.

11         Q.    And did that upset you that American

12   Psycho was not being offered to York Square

13   Cinemas as a first run in the New Haven area?

14         A.    Yes.

15                MR. SPODICK:  Wait, please.

16                MR. BOWERMAN:  Just for the record,

17   you'll have ample opportunity to ask questions

18   after, Peter.  I know we've had a lot of these

19   interims, and we've been good about them.  You'll

20   have plenty of time to ask questions when we're

21   done.

22                MR. SPODICK:  I'm not interrupting

23   the question.

24   BY MR. BOWERMAN:

MORGILLO & FLYNN, L.L.C.

1          Q.   Was it your expectation that American

2     Psycho would be commercially successful?

3          A.   I have no idea as to that.  I thought it

4     might be successful if shown at our theater.

5          Q.   And why did you believe that?

6          A.   From various items of publicity in the

7     trade press of the nature of the film, its cast,

8     its credits, it sounded like a York Square

9     picture, quote/unquote.

10         Q.   What about it sounded like a York Square

11    picture?  That's what I'm trying to understand.  I

12    haven't seen the film.  What about that?

13         A.   We didn't have an opportunity to find

14    out if that would have been so.

15         Q.   Did you see the film?

16         A.   No.

17         Q.   Do you have any knowledge as to whether

18    or not it was, in fact, commercially successful?

19         A.   No.

20         Q.   The letter goes on in paragraph 3 to

21    state towards the end:  At that point and when

22    related federal civil rights complaints are all

23    lined up, there will be a broad release to the

24    trade and national press.  It will be, I think, a

MORGILLO & FLYNN, L.L.C.

1    significant national story.

2             What are you referring to there?

3        A.   Reference to the enclosed newspaper

4    front page and the Yale editorial that were

5    enclosed with the letter.

6             I might add, incidentally, that this

7    copy does not carry the letterhead of the York

8    Square as identifying this document.

9        Q.   I understand the original would have

10   been on your letterhead, correct?

11       A.   Yes.

12       Q.   So it's your belief that American Psycho

13   might have had some commercial success, and rather

14   than offer it to York Square Cinemas, it was being

15   licensed at Showcase Orange first run; is that

16   correct?

17       A.   What is correct is that without

18   supposition as to its commercial properties by me,

19   it was decided by Lion's Gate that it would not be

20   shown at our theater, but at Showcase Orange.

21            It was their decision to make.  They did

22   not care to have us show the film.

23            Also at the same time at our theater,

24   since we don't care who else shows the film, since

                 MORGILLO & FLYNN, L.L.C.

1      we think ours is a separate and, as I used the

2      word, discrete market.

3           Q.   Do you know if any other theaters

4      exhibited American Psycho in the area?  For

5      example, did Hoyt's Branford exhibit American

6      Psycho?

7           A.   I don't know.

8           Q.   I'll call it a phenomenon or instance

9      where you've had a relationship of some type with

10     a distributor of motion pictures and when,

11     apparently, the distributor was of the belief,

12     whether accurate or otherwise, that a film might

13     be of some commercial success.

14          For those films that they believe might

15     be commercially successful they've licensed them

16     to either Showcase Orange rather than York

17     Square.  It's happened in the past other than

18     Lion's Gate, hasn't it?  You testified about that

19     last time, didn't you?

20          A.   Yes.

21          Q.   And in this instance it was Lion's Gate

22     that, apparently, the film was American Psycho

23     and, apparently, they believe might have had some

24     more commercial success than some of their other

MORGILLO & FLYNN, L.L.C.

1    films, and they went and licensed that first run

2    in New Haven and Showcase Orange?

3         A.   Yes.

4         Q.   Artisans, which licensed to you Blair

5    Witch project, when they came through with a

6    sequel, Blair Witch 2, they licensed that to

7    Showcase Orange first run and not York Square

8    Cinema; isn't that correct?

9         A.   Yes.

10        Q.   And I think Fox was another Beta film --

11   was it Anna -- the film we discussed the last

12   time --

13        A.   Yeah.

14        Q.   -- was going to have some commercial

15   success.

16        A.   I certainly hope so.

17        Q.   Apparently, it was a very expensive film

18   to produce?

19        A.   In answering these three questions,

20   yes.  I should add that we responded or -- we did

21   not respond, we offered, in the absence of an

22   offer from them, to show the film at our theater

23   in addition to any other theater that they wished

24   to show it at.

MORGILLO & FLYNN, L.L.C.

1           And that it was our belief, and it still

2    is, that they're sacrificing the additional

3    revenue that the New Haven and downtown market

4    audience could produce for the film.  They choose

5    not to, and we continue to make the point to them,

6    that we object to this judgment.

7           Q.   You're objecting to their judgment, and

8    the three examples we just used are:  Artisans in

9    it's licensing of Blair Witch 2; Lion's Gate in

10   its licensing of American Psycho; and 20th Century

11   Fox in its licensing of Anna and the King?

12          A.   And beyond that.

13          Q.   Sticking to those three --

14          A.   You may.

15          Q.   -- for those at least we've identified,

16   you've objected to their licensing them, and each

17   of those films happened to be licensed first run

18   in New Haven to Showcase Orange; isn't that

19   accurate?

20          A.   Yes.

21          Q.   And was not licensed at the same time

22   with York Square Cinemas; is that correct?

23          A.   Yes.

24          Q.   And it's your contention that each of

## C E R T I F I C A T E

I hereby certify that I am a Notary Public in and for the State of Connecticut duly commissioned and qualified to administer oaths.

I further certify that the deponent named in the foregoing deposition was by me duly sworn and thereupon testified as appears in the foregoing deposition; that said deposition was taken by me stenographically in the presence of counsel and transcribed by means of computer-aided transcription by the undersigned, and the foregoing is a true and accurate transcript of the testimony.

I further certify that I am neither of counsel nor attorney to either of the parties to said suit, nor of either counsel in said suit, nor related to or employed by any of the parties or counsel to said suit, nor am I interested in the outcome of said cause.

Witness my hand and seal as Notary Public this 26th day of December, 2000.

_____

NOTARY PUBLIC

My commission expires:  October 2002

MORGILLO & FLYNN, L.L.C.

# Tab C

2004 U.S. Dist. LEXIS 2900, *

## LEXSEE 2004 US DIST LEXIS 2900

**Applera Corporation and Roche Molecular Systems, Inc., plaintiffs, v. MJ Research Inc. and Michael and John Finney, defendants.**

### 3:98cv1201 (JBA)

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

### 2004 U.S. Dist. LEXIS 2900

### February 24, 2004, Decided

**SUBSEQUENT HISTORY:** Motion denied by, in part Applera Corp. v. MJ Research Inc., 2004 U.S. Dist. LEXIS 2929 (D. Conn., Feb. 24, 2004)

**PRIOR HISTORY:** Applera Corp. v. MJ Research, Inc., 2004 U.S. Dist. LEXIS 2842 (D. Conn., Feb. 24, 2004)

**DISPOSITION:** Plaintiffs' motion in limine to preclude defendants from arguing that patents-in-suit were not infringed, directly or by inducement, on basis that they were allegedly invalid or unenforceable granted.

## CASE SUMMARY:

**PROCEDURAL POSTURE:** Plaintiff corporations filed a patent infringement action against defendants, a corporation and two individuals. Plaintiff filed a motion to preclude defendants from providing any argument, testimony, or other evidence at trial that the patents-in-suit were not infringed, directly or by inducement, on the grounds that the patents were allegedly invalid or unenforceable.

**OVERVIEW:** Plaintiffs were concerned that one of the individual defendants intended to offer testimony that defendants could not have infringed the patents-at-suit because the patents were either invalid or unenforceable. Defendants contended that they did not intend to argue that the patents were invalid or unenforceable, only that they could not be liable for any such infringement. The court noted that the parties were essentially in agreement with the legal premise that a patent could be infringed notwithstanding that it might be invalid or unenforceable, and counsel was not to argue this point. Defendants were allowed to argue that they did not have any liability for patent infringement if the patents were found to be invalid or unenforceable. Legal opinions that defendants

might have received on this point were not relevant to the question of liability.

**OUTCOME:** The court granted plaintiffs' motion in limine.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Patent Law > Infringement > Defenses > Invalidity*
[HN1] A party seeking a declaratory judgment of invalidity of a patent presents a claim independent of the patentee's charge of infringement.

*Patent Law > Infringement > Defenses > Invalidity*
[HN2] Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity.

*Patent Law > Infringement > Burdens of Proof Patent Law > Infringement > Defenses > Invalidity*
[HN3] When presented with patent validity and infringement issues, trial courts should decide both. The parties, witnesses and exhibits involved in both issues are before the court. If a judgment limited to one issue is reversed, it may become necessary to again call many of the same persons before the court for trial or argument on the other. In any event, a remand would normally be necessary for a return by the trial court to whatever fact finding process may be involved in a determination of the undecided issue.

*Patent Law > Infringement > Burdens of Proof Patent Law > Infringement > Defenses > Invalidity*
[HN4] The simple fact is that a patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct. Similarly, a valid patent may be, in the abstract, infringed, that is, the accused device may fall within the

2004 U.S. Dist. LEXIS 2900, *

scope of the claim, but there will be no liability to the patentee when the patent is unenforceable. Thus the conduct-of-the-applicant-in-the-United States Patent and Trademark Office issue raised in the nonjury trial and the separated infringement/validity issues are distinct and without commonality either as claims or in relation to the underlying fact issues.

COUNSEL: [*1] For Roche Molecular Systems, Inc., Plaintiff: Asim Varma, David Gersch, Arnold & Porter, Washington, DC. James Sicilian, Day Berry & Howard-Htfd-CT, Hartford, CT. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY. Jennifer K. Lawson, Day, Berry & Howard, Hartford, CT. Mario R. Borelli, Day, Berry & Howard, Hartford, CT. Michael J. Klyce, Jr., Arnold & Porter, Washington, DC.

For Applera Corp, Plaintiff: Edward R. Reines, Weil, Gotshal & Manges, Redwood Shores, CA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY. John Josef Molenda, Orrick, Herrington & Sutcliffe, New York, NY. Patrick J. Hoeffner, Orrick Herrington & Sutcliffe, New York, NY. Sharon Yang, Orrick, Herrington & Sutcliffe-NY, New York, NY. James T. Shearin, Pullman & Comley, Bridgeport, CT.

For MJ Research, Inc, Defendant: Albert L. Jacobs, Jr., Greenberg Traurig, New York, NY. C. Allen Foster, Greenberg Traurig, LLP, Washington, DC. Daniel A. Ladow, Graham & James, New York, NY. Donna Nelson Heller, Finn Dixon & Herling, Stamford, CT. Gerard F. Diebner, Greenberg Traurig, New York, NY. Harold Bolton Finn, III, Finn Dixon & Herling, Stamford, CT. John E. Beerbower, Cravath, Swaine & [*2] Moore, New York, NY. Joseph B. Darby, III, Greenberg & Traurig, Boston, MA. Joseph M. Manak, Greenberg, Traurig, New York, NY. Kevin E. Stern, Greenberg Traurig, LLP, Washington, DC. Meghan H. Alger, Finn Dixon & Herling, Stamford, CT. Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT.

For Michael Finney, Defendant: C. Allen Foster, Greenberg Traurig, LLP, Washington, DC. Daniel A. Ladow, Graham & James, New York, NY. Gerard F. Diebner, Greenberg Traurig, New York, NY. Joseph M. Manak, Greenberg, Traurig, New York, NY. Kevin E. Stern, Greenberg Traurig, LLP, Washington, DC. Meghan H. Alger, Finn Dixon & Herling, Stamford, CT. Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT. Donna Nelson Heller, Finn Dixon & Herling, Stamford, CT. John E. Beerbower, Cravath, Swaine & Moore, New York, NY.

For John Finney, Defendant: C. Allen Foster, Greenberg Traurig, LLP, Washington, DC. Daniel A. Ladow, Graham & James, New York, NY. Gerard F. Diebner, Greenberg Traurig, New York, NY. Joseph M. Manak,

Greenberg, Traurig, New York, NY. Kevin E. Stern, Greenberg Traurig, LLP, Washington, DC. Meghan H. Alger, Finn Dixon & Herling, Stamford, CT. Patrick J. McHugh, Finn Dixon & Herling, [*3] Stamford, CT. Donna Nelson Heller, Finn Dixon & Herling, Stamford, CT. John E. Beerbower, Cravath, Swaine & Moore, New York, NY.

For MJ Research, Inc, Counter Claimant: Daniel A. Ladow, Graham & James, New York, NY. Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT.

For Roche Molecular Systems, Inc., Counter-Claimant: James R. Shearin, Pullman & Comley, Bridgeport, CT.

JUDGES: Janet Bond Arterton, U.S.D.J.

OPINIONBY: Janet Bond Arterton

OPINION:

Ruling on Plaintiffs' Motion in Limine to Preclude Defendants from Arguing that the Patents-in-Suit are Not Infringed, Directly or by Inducement, on the Basis that They are Allegedly Invalid or Unenforceable [Doc. # 762-8]

Plaintiffs move to preclude defendants from providing any argument (or testimony or other evidence) at trial that the patents-in-suit are not infringed, directly or by inducement, on the grounds that the patents are allegedly invalid or unenforceable, contending that such an argument, if made, would directly contradict well-established United States Supreme Court and Federal Circuit precedents, which provide that patent infringement is a separate and distinct issue from validity and enforcement and to be determined [*4] separately. Plaintiffs cite, among other cases, Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 96, 124 L. Ed. 2d 1, 113 S. Ct. 1967 (1993); n1 Spectra-Physics, Inc. v. Coherent, Inc., 827 F.2d 1524, 1535 (Fed. Cir. 1987); n2 Medtronic, Inc. v. Cardiac Pacemakers, Inc., 721 F.2d 1563, 1583 (Fed. Cir. 1983); n3 Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1540-41 (Fed. Cir. 1983); n4 Gardco Mfg, Inc. v. Herst Lightning Co., 820 F.2d 1209, 1213 (Fed. Cir. 1987). n5 The impetus for plaintiffs' motion is the concern raised by one of defendants' answers to plaintiffs' interrogatories and deposition testimony of individual defendant Michael Finney and defendants' opinion counsel Jason Mirabito to the effect that a patent can not be infringed that is either invalid or unenforceable. See Cote Decl. [Doc. # 784] Ex. 20 at 2-3 Pl.c; n6 Michael Finney Depo. at 538: 8-19; n7 Supp. Cote Decl. [Doc. # 824] Ex. 84 (Mirabito Depo.) at 42: 11-14. n8

n1 [HN1] "A party seeking a declaratory

judgment of invalidity presents a claim independent of the patentee's charge of infringement." [*5]

n2 "[An instruction] to the jury that invalid claims cannot be infringed is a nonsense statement...."

n3 [HN2] "Though an invalid claim cannot give rise to liability for infringement, whether it is infringed is an entirely separate question capable of determination without regard to its validity."

n4 [HN3] "When presented with patent validity and infringement issues, trial courts should ... decide both. ... the parties, witnesses and exhibits involved in both issues are before the court. If a judgment limited to one issue is reversed, it may become necessary to again call many of the same persons before the court for trial or argument on the other. In any event, a remand would normally be necessary for a return by the trial court to whatever fact finding process may be involved in a determination of the undecided issue."

n5 [HN4] "The simple fact is that a patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct. Similarly, a valid patent may be (in the abstract) infringed, that is, the accused device may fall within the scope of the claim, but there will be no liability to the patentee when the patent is unenforceable. Thus the conduct-of-the-applicant-in-the-PTO issue raised in the nonjury trial and the separated infringement/validity issues are distinct and without commonality either as claims or in relation to the underlying fact issues." [*6]

n6 "[Defendants do not infringe the patents-in-suit because] plaintiffs have engaged in patent misuse and have acted in violation in (sic) federal and state antitrust laws, including, but not limited to, Sections 1 and 2 of the Sherman Act, through their anticompetitive licensing scheme/thermal cycler authorization program. As a result, the Patents-In-Suit are invalid and unenforceable and there is no inducement of infringement."

n7

Q. How did you come to the conclusion that the machine probably infringes?

A. Based on my own reading of the claims as they were written ... except for the fact you can't infringe an invalid patent.

Mem. [Doc. # 772-8] at 3 n.1. Plaintiffs did not submit the actual deposition transcript as an exhibit or, if they did, did not direct the Court to it; defendants, however, do not take issue with the substance of the quotation.

n8

Q. What does this mean?

A. What this means is irrespective of the issue of validity, which of course if the patent is invalid, none of the claims would be infringed....

Defendants characterize [*7] the motion as "unduly vague, ... speculative and premature," Opp'n [Doc. # 859] at 1, but allow that they do "not intend to argue that patents-in-suit are not infringed because they are invalid or unenforceable, only that there can be no liability for any such infringement." Id. at 1-2. Plaintiffs next take issue with defendants' additional statement: "MJ will argue that opinions concerning invalidity and unenforceability are relevant to the intent element of inducement of infringement." Id. at 2.

Thus, the parties are in agreement with the legal premise that a patent can be infringed notwithstanding that it may also be invalid or unenforceable, and counsel will be expected to refrain from arguing or eliciting testimony to the contrary. Defendants may argue that they have no liability for any patent infringement found if that patent is found invalid or unenforceable. They may not argue, however, that opinions concerning invalidity and unenforceability are relevant to the intent element of 35 U.S.C. § 271(b). Legal opinion is only relevant to the intent analysis to the extent the advice bears on whether the alleged direct infringer actually infringes [*8] patented claims. See Manville Sales Corp. v. Paramount Systems, Inc., 917 F.2d 544, 553-54 (Fed. Cir. 1990). n9 Opinions on validity or unenforceability, which bear on infringement only with respect to liability, are thus legally irrelevant as to whether or not the alleged indirect infringer has the requisite intent to induce actual infringement. As set forth above, plaintiffs' motion [Doc. # 762-8] is GRANTED.

n9 For discussion of the Court's determination that the Manville Sales standard for

2004 U.S. Dist. LEXIS 2900, *

intent under 35 U.S.C. § 271(b) will be applied, the reader is directed to the Court's ruling on plaintiffs' motion in limine Doc. # 762-7.

IT IS SO ORDERED.

/s/

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 24th day of February 2004.**

2004 U.S. Dist. LEXIS 1560, *; 2004-1 Trade Cas. (CCH) P74,297

LEXSEE 2004 U.S. DIST. LEXIS 1560

**Applera Corporation and Roche Molecular Systems, Inc., plaintiffs, v. MJ Research Inc. and Michael and John Finney, defendants.**

**3:98cv1201 (JBA)**

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT**

**2004 U.S. Dist. LEXIS 1560; 2004-1 Trade Cas. (CCH) P74,297**

**February 5, 2004, Decided**

**SUBSEQUENT HISTORY:** Motion granted by Applera Corp. v. MJ Research, Inc., 2004 U.S. Dist. LEXIS 2384 (D. Conn., Feb. 11, 2004)

**PRIOR HISTORY:** Applera Corp. v. MJ Research Inc., 2004 U.S. Dist. LEXIS 1465 (D. Conn., Feb. 3, 2004)

**DISPOSITION:** Plaintiffs' motion in limine to exclude evidence of and arguments based upon plaintiffs' bringing of this action and threats of similar actions granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs sought to exclude defendant's evidence and arguments that plaintiffs threatened thermal cycler suppliers with litigation for patent infringement, and followed up their threats to defendant with the instant patent infringement litigation, as part of an effort to secure licenses for improper and anticompetitive purposes. Plaintiffs claimed that the evidence was irrelevant and immunized under the Noerr-Pennington doctrine.

**OVERVIEW:** Plaintiffs' evidence on inducement was comprised largely of defendant's own documentation and defendant did not challenge it. It was not disputed that plaintiffs' patents covered the use of a thermal cycler to perform in defendant's fields. Defendants, as a supplier of thermal cyclers, could have been liable if it was found that they "actively induced infringement" of plaintiff's patents. Whether defendants in fact induced infringement was a matter for trial. The evidence, however, was fully sufficient to establish that plaintiffs had a realistic expectation of succeeding in their claims against defendants on infringement and inducing infringement, such that they were making proper use of the judicial system as patent holders exercising their patent rights.

The litigation plaintiffs brought or threatened to bring was not objectively baseless, and defendant offered nothing to show that no reasonable litigant could believe there was a realistic chance of success on the infringement claim, or that plaintiffs had no interest in the outcome of the lawsuit itself. Also, the Noerr-Pennington doctrine extended to pre-litigation threats, even if more than one suit was threatened.

**OUTCOME:** The court granted plaintiffs' motion in limine and precluded defendant from offering evidence or making arguments that filing this patent infringement lawsuit, or making threats of similar litigation, violated the Sherman Act.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington DoctrinePatent Law > Infringement > DefensesPatent Law > Remedies > Bad Faith Enforcement*
[HN1] It is well established that a patent owner bringing suit for patent infringement is exempt from the antitrust laws, even though such suit may have anticompetitive effect, unless the infringement defendant proves that the infringement suit is a mere sham. This doctrine, originally developed to provide antitrust immunity to entities petitioning public officials, has two components. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of the test, a court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor.

*Patent Law > Infringement > Burdens of ProofPatent*

2004 U.S. Dist. LEXIS 1560, *; 2004-1 Trade Cas. (CCH) P74,297

*Law > Infringement > Acts of Infringement*

[HN2] To prove an inducement claim, a plaintiff must establish that the defendant's actions induced infringing acts and that it knew or should have known its actions would induce actual infringement. Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington DoctrinePatent Law > Remedies > Bad Faith EnforcementPatent Law > Infringement > Acts of Infringement*

[HN3] The United States Court of Appeals for the Federal Circuit has applied the Noerr-Pennington doctrine to pre-litigation threats. The Federal Circuit has found the Noerr-Pennington doctrine to apply even if the patent holder threatened more than one infringement suit.

*Antitrust & Trade Law > Exemptions & Immunities > Noerr-Pennington DoctrinePatent Law > Remedies > Bad Faith EnforcementPatent Law > Infringement > Acts of Infringement*

[HN4] Whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of United States Court of Appeals for the Federal Circuit law. This conclusion applies equally to all antitrust claims premised on the bringing of a patent infringement suit.

**COUNSEL:** For Roche Molecular Systems, Inc, PLAINTIFF: Asim Varma, Arnold & Porter, Washington, DC USA. David Gersch, Arnold & Porter, Washington, DC USA. James Sicilian, Day, Berry & Howard-HTFD-CT, Hartford, CT USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA, Jennifer K Lawson, Day, Berry & Howard, Hartford, CT USA. Mario R Borelli, Day, Berry & Howard, Hartford, CT USA. Michael J Klyce, Jr, Arnold & Porter, Washington, DC USA.

For Applera Corp, PLAINTIFF: Edward R Reines, Weil, Gotshal & Manges, Redwood Shores, CA USA. Jennifer Gordon, Orrick, Herrington & Sutcliffe, New York, NY USA, John Josef Molenda, Orrick, Herrington & Sutcliffe, New York. Patrick J Hoeffner, Orrick, Herrington, Sutcliffe, New York, NY USA. Sharon Yang, Orrick, Herrington & Sutcliffe-NY, New York, NY USA. James T Shearin, Pullman & Comley, Bridgeport, CT USA.

For MJ Research, Inc, DEFENDANT: Albert L Jacobs, Jr, Greenberg Traurig, New York, NY USA. C Allen Foster, Greenberg Traurig, LLP, Washington, DC USA. Daniel A Ladow, Graham & James, New York, NY USA. Donna Nelson Heller, Finn Dixon & Herling, Stamford, CT USA. Gerard F Diebner, Greenberg

Traurig, New York, NY USA. Harold Bolton Finn, III, Finn, Dixon & Herling, Stamford, CT USA. John E Beerbower, Cravath, Swaine & Moore, New York, NY USA. Joseph B Darby, III, Greenberg & Traurig, Boston, MA USA. Joseph M Manak, Greenberg Traurig, New York, NY USA. Kevin E Stern, Greenberg Traurig, LLP, Washington, DC USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA.

For Michael Finney, DEFENDANT; C Allen Foster, Greenberg Traurig, LLP, Washington, DC USA. Daniel A Ladow, Graham & James, New York, NY USA. Gerard F Diebner, Greenberg Traurig, New York, NY USA. Joseph M Manak, Greenberg Traurig, New York, NY USA. Kevin E Stern, Greenberg Traurig, LLP, Washington, DC USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA. John E Beerbower, Cravath, Swaine & Moore, New York, NY USA.

For John Finney, DEFENDANT: C Allen Foster, Greenberg Traurig, LLP, Washington, DC USA. Daniel A Ladow, Graham & James, New York, NY USA. Gerard F Diebner, Greenberg Traurig, New York, NY USA. Joseph M Manak, Greenberg Traurig, New York, NY USA. Kevin E Stern, Greenberg Traurig, LLP, Washington, DC USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA. John E Beerbower, Cravath, Swaine & Moore, New York, NY USA.

For MJ Research, Inc Counter CLAIMANT: Daniel A Ladow, Graham & James, New York, NY USA. Patrick J McHugh, Finn Dixon & Herling, Stamford, CT USA.

For Roche Molecular Systems, Inc, Counter DEFENDANT: James T Shearin, Pullman & Comley, Bridgeport, CT USA.

**JUDGES:** [*1] Janet Bond Arterton, United States District Judge.

**OPINIONBY:** Janet Bond Arterton

**OPINION:**

   Ruling on Motion in Limine to Exclude Evidence of and Arguments Based Upon Plaintiffs' Bringing of this Action and Threats of Similar Actions [Doc. # 667 (1)]

   Plaintiffs Applera Corp. and Roche Molecular Systems, Inc. seek to exclude defendant MJ Research Inc.'s evidence and arguments that plaintiffs threatened thermal cycler suppliers with litigation for patent infringement, and followed up their threats to MJ with this litigation, as part of an effort to secure licenses for improper and anticompetitive purposes. Applera claims that this evidence is legally irrelevant since such conduct is immunized from antitrust liability under the Noerr-

Case 3:00-cv-00706-SRU    Document 99-2    Filed 03/30/2004    Page 32 of 35

Page 3

2004 U.S. Dist. LEXIS 1560, *; 2004-1 Trade Cas. (CCH) P74,297

Pennington doctrine. For the reasons discussed below, plaintiffs' motion is GRANTED.

I. Discussion n1

> n1The Court assumes familiarity with the facts of this case. See, e.g. Ruling on Plaintiffs' Motion to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 874].

[*2]

[HN1] It is well established that a patent owner bringing suit for patent infringement "is exempt from the antitrust laws, even though such suit may have anticompetitive effect, unless the infringement defendant proves . . . that the infringement suit is a mere sham." CSU, L.L.C. v. Xerox Corp. (In re Independent Serv. Orgs. Antitrust Litig.), 203 F.3d 1322, 1326 (Fed. Cir. 2000). This doctrine, originally developed to provide antitrust immunity to entities petitioning public officials, see Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144, 5 L. Ed. 2d 464, 81 S. Ct. 523 (1961); Mine Workers v. Pennington, 381 U.S. 657, 669-70, 14 L. Ed. 2d 626, 85 S. Ct. 1585 (1965), has two components. "First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. . . . Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part [of the test], the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor.'" Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49, 60-61, 123 L. Ed. 2d 611, 113 S. Ct. 1920 (1993). [*3]

Plaintiffs claim that this suit, which in relevant part charges defendants with inducing infringement of their PCR process patents, is not "objectively baseless" because there is evidence that MJ "(1) specifically designs, tests, and optimizes its thermal cyclers and consumables for PCR n2; (2) pre-programs its thermal cyclers for the performance of PCR [prior to 2001] n3; (3) heavily advertises and promotes its thermal cyclers for PCR n4; (4) advises and assists its customers in implementing PCR on its thermal cyclers n5; that (5) over eighty percent of MJ's customers use their thermal cyclers for PCR n6; and (6) the success of MJ's thermal cycler business is attributable to PCR n7; [and] (7) few of MJ's customers have any independent end user license to practice PCR on their thermal cyclers. n8" Memorandum in Support of Plaintiffs' Motion to Exclude Evidence of And Arguments Based Upon Plaintiffs' Bringing of this Action and Threats of Similar Actions [Doc. # 670] at 9. Applera's evidence on inducement is

comprised largely of MJ's own documentation and the deposition testimony of MJ employees, and MJ has not challenged the veracity of the MJ documentation.

> n2 See, e.g., Deposition Transcript of John Hansen ("Hansen Tr.") [Doc. # 670, Ex. 4] at 159, 404-05, 499-500; Deposition Transcript of Michael Mortillaro [Doc. # 670, Ex. 5] at 55; Deposition Transcript of Daniel Sullivan [Doc. # 670, Ex. 6] at 142-43, 146-47, 217-18. [*4]

> n3 See, e.g. Deposition Transcript of Michael Finney ("Finney Tr.") [Doc. # 670, Ex. 7] at 182-83, 201-04, 207-08, 213-15, 219. MJ states that it removed the instrument programming training examples from the computer in its thermal cyclers in January 2001. See Declaration of John Finney [Doc. # 745] at P6.

> n4 See, e.g., Hansen Tr. [Doc. # 670, Ex. 4] at 254-64, 26771, 274, 285-90; MJ Research Notebook [Doc. # 670, Ex. 4].

> n5 See Deposition Transcript of Robin Buell [Doc. # 670, Ex. 8] at 50-55, 70, 158-59, 163-65.

> n6 See M Finney Tr. [Doc. # 670, Ex. 7] at 175-76 ("I would guess of the thermal cyclers that we are currently selling at this point, perhaps 20 percent are never used to perform PCR"); Letter from Joseph Smith, PE to Michael Finney, MJ, Jan. 30, 1998 [Doc. # 671, Ex. 2] at 1 (stating that "worldwide, at least 93% of thermal cyclers need authorization" and offering to discount the royalty to reflect the 7% of thermal cyclers not used for PCR).

> n7 See MJ Memorandum dated Aug. 28, 1992 [Doc. # 670, Ex. 9] at MJ 6506263 ("The success we have achieved here did not just happen. We've ridden the wave of growth in PCR, but we haven't had any claim to the idea . . . ."); Finney Tr. [Doc. # 670, Ex. 7] at 145. [*5]

> n8 See, e.g., MJ Memorandum dated June 1998 [Doc. # 670, Ex. 10] at MJ 7002391 ("In spite of everything we are dealing with regarding PE and the stickers, the truth is most people don't bother to pay PE and get the sticker [i.e. end user license].").

As discussed in the Court's ruling of, it is not disputed that Applera's patents cover the use of a thermal

2004 U.S. Dist. LEXIS 1560, *; 2004-1 Trade Cas. (CCH) P74,297

cycler to perform PCR in Applera's fields. See Ruling on Motion in Limine to Exclude MJ's Evidence and Arguments Claiming PCR Rights are Tied to Authorized Thermal Cyclers [Doc. # 874] at 67 . Defendants, as a supplier of thermal cyclers, may be liable if it is found that they "actively induced infringement" of Applera's patents. See 35 U.S.C. § 271(b). [HN2] To prove their inducement claim, plaintiffs must establish that defendants' "actions induced infringing acts and that [they] knew or should have known [their] actions would induce actual infringement." Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1363 (Fed. Cir. 2003) (quoting Manville Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed.Cir.1990)). [*6] "Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent." Rodime PLC v. Seagate Tech., Inc., 174 F.3d 1294, 1306 (Fed.Cir. 1999). Whether defendants in fact induced infringement of plaintiffs' patents is a matter for trial. Facts in dispute, for example, include whether MJ's actions caused the direct infringement of the patent, as MJ has stated that it told its customers that they needed to obtain end user licenses from Applera to perform PCR on its thermal cyclers. The evidence that Applera has submitted, however, is fully sufficient to establish that plaintiffs had a realistic expectation of succeeding in their claims against defendants on infringement and inducing infringement, such that they were making proper use of the judicial system as patent holders exercising their patent rights. n9 As was disclosed to Applera during discovery, MJ's counsel informed Michael Finney that counsel was not able to "guarantee that [Applera] could not bring a credible action against you." See Letter of Joseph Darby to Michael J. Finney, June 7, 1994 [Doc. # 670, Ex. 2]. From Applera's evidence, it is clear [*7] the litigation it brought or threatened to bring was not objectively baseless, and MJ offers nothing to show that no reasonable litigant could believe there was a realistic chance of success on the infringement claim, or that plaintiffs had no interest in the outcome of the lawsuit itself. n10 Thus, plaintiffs' suit is entitled to antitrust immunity.

n9 In ruling on the parties' previous antitrust summary judgment motions, the Court (Squatrito, J. presiding), see Memorandum of Decision and Order [Doc. # 624], did not address whether this suit and Applera's threats of litigation were entitled to antitrust immunity.

n10 It is notable, in this regard, that MJ, not shy about engaging in motion practice, has not moved for summary judgment on inducing infringement, which would have obvious merit if indeed the suit were objectively baseless. The dismissal of a claim on summary judgement does

not necessarily mean the suit is objectively baseless, however. See Professional Real Estate Developers, 508 U.S. at 65 (finding that plaintiff's suit was not objectively baseless, even though summary judgment was granted in favor of defendants). While MJ notes that Applera's contributory infringement claim was dismissed by the Court, see Memorandum of Decision and Order [Doc. # 624], in light of the fact that Applera's core claims against MJ remain in this suit, MJ's attempt to segregate individual claims as baseless is perplexing.

[*8]

MJ posits that the Noerr-Pennington doctrine is limited to a case involving a single threat or lawsuit, and does not apply in this case because the plaintiffs engaged in a pattern of threats, many of which they have not acted upon, and which were based on legal theories that have since been withdrawn or dismissed by the Court. MJ's argument that plaintiffs' threats of suit and suit lose their immunity because "plaintiffs' legal strategy has been part and parcel of its monopolistic scheme . . . .", Defs.' Opposition [Doc. # 684] at 23, relies on Primetime 24 Joint Venture v. NBC., 219 F.3d 92 (2d Cir. 2000). n11 In Primetime, the Second Circuit concluded that in cases "in which the defendant is accused of bringing a whole series of legal proceedings . . . the relevant issue is whether the legal challenges are brought pursuant to a policy of starting legal proceedings without regard to the merits and for the purpose of injuring a market rival." Id. at 101 (citation and internal quotation marks omitted). Primetime, however, does not apply to this case, as this case concerns not "simultaneous and voluminous" [*9] legal proceedings, but rather a single lawsuit with "concerted efforts incident to litigation, such as prelitigation 'threat letters.'" Primetime, 219 F.3d at 100. As to these prelitigation threats, the Court in Primetime clearly acknowledged the extension of the Noerr-Pennington doctrine. See id. (citing McGuire Oil Co. v. Mapco, Inc., 958 F.2d 1552, 1560 (11th Cir. 1992); Coastal States Mktg., Inc. v. Hunt, 694 F.2d 1358, 1367-68 (5th Cir. 1983)). [HN3] The Federal Circuit has also applied the Noerr-Pennington doctrine in this context. See, e.g. C.R. Bard, Inc. v. M3 Systems, Inc., 157 F.3d 1340, 1368 (Fed. Cir. 1998) (applying the two-part test for "sham" litigation to allegation that "Bard threatened and then brought suit knowing that its patents were invalid, unenforceable, or not infringed"). The Federal Circuit has found the Noerr-Pennington doctrine to apply even if the patent holder threatened more than one infringement suit. See Glass Equip. Dev., Inc. v. Besten, Inc., 174 F.3d 1337, 1344 (Fed. Cir. 1999) (stating that test for "sham litigations" would apply [*10] to "actual or threatened infringement suits").

Case 3:00-cv-00706-SRU   Document 99-2   Filed 03/30/2004   Page 34 of 35

Page 5

2004 U.S. Dist. LEXIS 1560, *; 2004-1 Trade Cas. (CCH) P74,297

n11 It should be noted that Second Circuit precedent is not binding in this case. See Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1068 (Fed. Cir. 1998) (holding that [HN4] "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law. This conclusion applies equally to all antitrust claims premised on the bringing of a patent infringement suit.").

It is important to recognize the context in which the Second Circuit reached its decision in Primetime. In Primetime, the television networks attempted to avoid the Satellite Home Viewers Act's requirement that the networks license their signals to satellite broadcasters at a statutorily fixed royalty fee for viewers who were not able to receive a sufficiently strong broadcast signal, by indiscriminately filing "huge volumes" of legal challenges to the satellite provider's [*11] estimate of the signal-strength designated households received. See Primetime, 219 F.3d at 95-96, 101 (characterizing the legal challenges as "automatic petitioning"). In order to determine which of these challenges had merit, a Court would have to engage in a highly individualized factual determination of the signal strength each of the thousands of households received. It was in this context that the Count found that "it is immaterial that some of the claims might, as a matter of chance, have merit." Id. at 101 (citation and internal quotation marks omitted).

In contrast, here there is one lawsuit at issue, and the magnitude of threats to thermal cycler suppliers is far lower than magnitude of legal challenges in Primetime. The number of suppliers in the market is in dispute, but does not exceed 34. In addition, the statements that Applera made to suppliers that MJ has identified all have similar factual foundations related to the conduct claimed by Applera to have been potentially infringing its patent rights. See, e.g. Letter of Hanna Fischer to Marc Vader Linden [Doc. # 470, Ex. 44] ("Promoting for PCR, selling to PCR users and/or [*12] supporting for PCR induces infringement. We note that your company's literature displays a typical PCR cycler, includes 'touch-down' PCR programming and advertises thermal cycler accessories to 'protect your PCRs.' We consider this to be promoting for PCR."); Letter of Hanna Fischer to Biozym Diagnostik GmbH, Sept. 29, 1997 [Doc. # 470, Ex. 46]("[Applera] considers advertising, promoting, selling and supporting thermal cyclers for use in the PCR process in research and other certain fields to be inducement of unlicensed use of the patented process."); Letter of Hanna Fischer to Geoff Rampton, Nov. 20, 1995 [Doc. # 470, Ex. 50] ("As to the PCR process patents, Techne is advertising and promoting its thermal

cyclers for use in PCR, a clear inducement of infringement under U.S. law."); Letter of Hanna Fischer to Marc Vader Linden, [Doc. # 470, Ex. 53] ("We expect that Appligene must continue to support its current installed base of thermal cyclers, both from a service and technical support perspective. In doing so, Appligene will very likely be continuing to both directly infringe and induce infringement of the apparatus and PCR patent rights unless all customers have obtained [*13] the necessary rights."). MJ has also submitted evidence that some of these suppliers responded to Applera by accepting the licensing agreement in order "to avoid legal actions on the long run." See, e.g. Letter of B. Ganahl to Hanna Fischer, Oct. 12, 1998 [Doc. # 470, Ex. 54]; Letter of Simon Constantine to Michael Hunkapiller, Jul. 25, 1997 [Doc. # 470, Ex. 38] ("[Applera widely and aggressively publicized its rights to these patents and its intent to stop any and all infringement of them by all means necessary, including active litigation as required. This threat, and promise, has been frequently repeated in our various conversations on this matter, and was a major factor in inducing us to be among the first to take a license from you . . ."); Letter of Hubert Wagner to Hanna Fischer, Oct. 19, 1995 ("Barnstead Thermolyne . . . is willing, to avoid litigation, to consider a license on terms less onerous than those proposed in your letter . . ."). This evidence of Applera's threats to thermal cycler suppliers can and must be evaluated first under the "objectively baseless" standard. The statements Applera made in letters about its position on what practices constitute [*14] infringement or inducing infringement cannot be said to be without a realistic chance of success on the merits.

While MJ notes that it has based its antitrust claims against the plaintiffs on more than simply the threats of baseless lawsuits, the plaintiffs' motion in limine is addressed only to the legal relevance of evidence of these threats as support for MJ's antitrust claim that threats of litigation were improperly used to unlawfully impair competition. As discussed above, the "pattern of threats" Applera made to thermal cycler suppliers, as identified in MJ's opposition to this motion and in MJ's earlier summary judgment submissions, see [Doc. # 684] at 22; [Doc. # 470, Exs. 8-9, 21-24, 38, 43-46, 50-56], are not objectively baseless and therefore are not relevant as support for MJ's antitrust claims. See Professional Real Estate Investors, 508 U.S. at 60-61; see also Pennington, 381 U.S. at 670 ("Such conduct is not illegal, either standing alone or as part of a broader scheme itself violative of the Sherman Act.").

II. Conclusion

For the foregoing reasons, Plaintiffs' Motion in Limine to Exclude Evidence of and Arguments Based [*15] Upon Plaintiffs' Bringing of this Action and Threats of Similar Actions [Doc. # 667 (1)] is

2004 U.S. Dist. LEXIS 1560, *; 2004-1 Trade Cas. (CCH) P74,297

Page 6

GRANTED, and MJ is precluded from offering evidence or making arguments that filing this patent infringement lawsuit, or making threats of similar litigation, violates the Sherman Act.

    IT IS SO ORDERED.

Janet Bond Arterton, U.S.D.J.

**Dated at New Haven, Connecticut, this 5th day of February 2004.**