UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BROADWAY THEATRE CORP.     )
                           )
                           )
                           )
V.                         ) CIVIL ACTION NO: 300-CV00706 (SRU)
                           )
                           )
                           )
BUENA VISTA PICTURES       )
DISTRIBUTION, ET AL.       ) APRIL 23, 2004

## OPPOSITION TO DEFENDANT LION'S GATE
## PICTURES' MOTION IN LIMINE

The Plaintiff, Broadway Theatre Corporation, respectfully asks this Court to deny the Defendants' request for a Motion in Limine. The Motion presents, and reiterates, many of the facts which are the basis of the Plaintiff's complaint. These facts should simply be heard at trial.

The Plaintiff alleges that the various Defendants have all violated provisions of the Connecticut Unfair Trade Practices Act by refusing to license certain of their new films for exhibition in Downtown New Haven, Connecticut. Some of the Defendants will license no new films to play Downtown. Other Defendants, like Lion's Gate, will license some of their new films.

In this Court's ruling denying the Defendants' Motion for Summary Judgment, the Court addressed the practice of "clearances," which the Plaintiff alleges trigger the violation of the statute. Lion's Gate's Motion admits the presence of clearances in many licensing "bookings," and it is these individual contracts which the Plaintiff alleges are unlawful.

Lion's Gate correctly states that its presence in Plaintiff's complaint does not result from "any consistent practice on the part of Lion's Gate of refusing to license its films to the York Square on a first-run basis." (Motion, p. 5) Consistency is not at issue, and is not present in the Connecticut Unfair Trade Practices Act. Lion's Gate's presence in the complaint is simply due to statutory unfairness caused by any clearance in a booking with another theatre which proscribes and precludes the exhibition rights of the Plaintiff's York Square Cinemas. In this Court's ruling denying the Defendants' Motion for Summary Judgment, the Court addressed the nature of an offensive practice:

> (1) [W]hether the practice, without necessarily having ben previously considered Unlawful, offends public policy as it has been established by statutes, the common Law, or otherwise -- whether, in other words, it is within at least the penumbra of Some common law, statutory, or other established concept of unfairness; (2) Whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businessmen].

Sporty's Farm LLC v. Sportsman's Market, Inc., 202 F.3d 489, 501 (2d Cir. 2000). "All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Id.

The Plaintiff alleges that each booking is a separate contract, with its own terms, conditions, responsibilities, rights and duties. The contract between Lion's Gate and Broadway Theatre Corporation for exhibition of Lion's Gate's film "Mr. Jealousy," for example, is different from the contract for Plaintiff's exhibition of Lion's Gate's film "Two Family House." The contracts do not result from consistency or identical practice. Each is separate from the other.

The Plaintiff has alleged that certain of the unique, individual, separate exhibition contracts entered into by Lion's Gate contain unlawful elements which proscribe the rights of the Plaintiff, cause harms, and violate CUTPA. It is these contracts which are before this Court.

Lion's Gate presents many titles in discussing films which have played at the York Square, and elsewhere. Some played first-run Downtown, and some did not. For instance, "The films that have been exhibited at the York Square during this time period include many of Lion's Gate's most popular, acclaimed and valuable properties, among them *Gods and Monsters, The Red Violin, Monster's Ball, Amores Perros* and *Shattered Glass.*" (Motion, p.3.) Two of these five bookings, *Monster's Ball* and *Shattered Glass*, were of second-run films and were, like most second-run films, exhausted at the end of their suburban first-runs. Their popularity, 'acclaim' and 'value' were essentially gone. They had initially been clearance bookings, either one of which, Plaintiff alleges, was unlawful, and sufficient to support a CUTPA complaint.

Lion's Gate's Motion speaks at length of "The Cooler," a film distributed by this Defendant. The Cooler is similar to most Lion's Gate films: a specialized picture intended for a limited audience, with an extremely modest grossing potential. It's domestic gross" was $8.3 million, which would place it as no.152 on the gross list of films for 2004, based on the 2003 Variety chart (See: attached Variety charts, top Grossing 250 films of 2003 and 2004.) This was a film which the Plaintiff desperately wanted to play, but was unable to meet Lion's Gate's demands. (See: Declaration of Robert Spodick, paragraphs 6-15.)

The Plaintiff contends that there is nothing new or significant in this Motion, or which has not been before this Court during the pendency of this complaint. A significant issue before this Court has been clearances, addressed at length by this Court when "Ruling On Defendants' Motion For Summary Judgment." Defendant Lion's Gate still actively employs clearances favoring theatres in the suburbs over the Downtown York Square, most recently with the licensing of the film "Girl With The Pearl Earring." The clearance has been accompanied by punishing retaliation against the Plaintiff, which the Plaintiff argues also violates the statute. "14. ...Since the time of their refusal to move back the booking of The Cooler, Lion's Gate has refused to accept any bookings from the York Square, especially for their recent film 'Girl With The Pearl Earring.' ...Lion's Gate has accepted no second-run booking of this, or any, film to play at the York Square." (See: Declaration of Robert Spodick, paragraph 14.)

The Plaintiff respectfully asks this Court to not grant leave for Defendant Lion's

4

Gate Pictures to file its Motion in Limine, and that the Motion not be granted.

THE PLAINTIFF

BROADWAY THEATRE CORPORATION

By: _____/s/_____

Peter C. Spodick  (ct 408103)
592 Central Avenue
New Haven, Connectitcut  06515
203 387 5714  (fax: 203 389 5732)

CERTIFICATION OF SERVICE

The defendant certifies that a copy of this motion was posted, by first class mail, pre-paid, this day, April 23, 2004, to:

Ben A. Solnit, Esq.
Elizabeth Andrews, Esq.
Richard Bowerman, Esq.
Tyler, Cooper and Alcorn
205 Church Street
New Haven, Connecticut
06510

---
Peter C. Spodick  ct 408103

DECLARATION OF ROBERT SPODICK

I, Robert C. Spodick, hereby declare the following:

1. I am the President of Broadway Theatre Corporation, which does business as the York Square Cinemas, in New Haven, Connecticut, and which is the Plaintiff in this complaint. I have had responsibility for the operation of the York Square from the time of it's planning for construction in 1970 until and including the present.

2. I made a statement in support of Broadway Theatre Corporation's Opposition to the Defendants' Motion for Summary Judgment, which was appended to the document Broadway Theatre filed in Opposition. The statement I am making now should include, by reference, my statement filed with this Court at that time.

3. I have read the Motion in Limine filed by Lion's Gate Pictures, which is a Defendant company in the York Square's complaint.

4. The York Square has been very pleased to play many first-run films from Lion's Gate, all of them falling into the "small film" category, meaning special interest films with a very limited grossing potential. The titles cited by Mr. Ortenberg in his statement as having played at the York Square are probably unfamiliar to all but the most diehard moviegoers.

They include "Buffalo 66," "Wonderland," "Jesus Son," "The Big Kahuna," and "The Daytrippers."

5. I am certain that all of these pictures were passed over by the turnpike chain theatres, and were then offered to the York Square. I am also certain that Mr. Ortenberg and

Lion's Gate recognize that the urban, university-oriented, intimate, downtown York Square audience is different from that of the mass-audience turnpike cinemas, and that the special-audience Lion's Gate films will produce higher grosses at the York Square than at a turnpike located theatre.

6. I offered to play "The Cooler" Christmas week at the York Square. Christmas week is known to be the highest grossing week of the year, and I believed that "The Cooler" would produce a very large film rental for Lion's Gate. I am certain that "The Cooler" would have played for at least several weeks, and believe that the boxoffice gross at the York Square would have been among the highest in Connecticut. Lion's Gate refused to accept the booking.

6. Lion's Gate would take a booking only in mid-January, long after the Christmas rush, and the enormous grossing opportunity, was past. That booking would include another theatre, "day-and-date," Cinema 1-4, located by an exit on Interstate 91 on the New Haven-North Haven town line.

7. Faced with a blank screen during Christmas week, and desperate to have something new to play, the York Square, at the last minute, booked "Cheaper By The Dozen" from 20th Century-Fox, the one major film company willing to play films downtown, "day-and-date" with theatres on the turnpike. (20th Century-Fox is not a Defendant in this complaint.)

8. Even though "Cheaper By the Dozen" grossed nationally over $137,000,000, one of the top ten grossing films of the year, I knew it was the wrong film for the York Square. "The Cooler," which nationally grossed only $8,000,000, would have better served our university audience. But Lion's Gate would not budge.

9. In January, when "Cheaper By the Dozen" had petered out, I told 20th Century-Fox that we had a commitment to Lion's Gate, and that we wanted to end "Cheaper By The Dozen." Fox would not allow the booking to end, demanding one additional week, even though they, and Lion's Gate, knew that the demand meant that the York Square would suffer a terrible loss. It was necessary for me to ask Lion's Gate to move The Cooler back a week, which is a very common industry "give and take" practice when an unanticipated hold-over occurs.

10. Lion's Gate refused. They immediately cancelled the booking at Cinema 1-4, and played The Cooler exclusively at the Showcase Cinemas in Orange.

11. The reported gross of the exclusive showing of the opening week of The Cooler at the Showcase in Orange was $3,152. I know that this gross represents a terrible loss at the Showcase.

12. The York Square's offer to play the film "a week later" was presented again to Lion's Gate, who refused the booking, and the accompanying opportunity to augment their "Cooler" income.

13. Since that time, I have repeatedly offered to play The Cooler at the York Square, but Lion's Gate has refused to book the film.

14. Since the time of their refusal to move back the booking of The Cooler, Lion's Gate has refused to accept any bookings from the York Square, especially for their recent film "Girl With The Pearl Earring." The initial first-run booking of Girl With The Pearl Earring was, in any case, a "clearance" booking on behalf of the Showcase Cinemas in Orange. Lion's Gate has accepted no second-run booking of this, or any, film to play at the York Square.

15. When calls have been made to book films from Lion's Gate, the salespeople deny the bookings, and make remarks such as "remember Cheaper By The Dozen!"

I declare under penalty of perjury under the laws of the United States of America that the foregoing statement is true and correct.

This Declaration is executed in New Haven, Connecticut, _Apr. 23_, (April 23), 2004.

_Robert C. Spodick_
ROBERT C. SPODICK