UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BROADWAY THEATRE CORP. | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO: 3:00-CV-00706 (SRU) |
| | ) | |
| BUENA VISTA PICTURES DISTRIBUTION, COLUMBIA PICTURES INDUSTRIES, INC. DREAMWORKS DISTRIBUTION L.L.C., LIONS GATE FILMS INC., METRO-GOLDWYN-MAYER DISTRIBUTION CO., MIRAMAX FILM CORP., NEW LINE CINEMA CORPORATION, PARAMOUNT PICTURES CORPORATION, SONY PICTURES RELEASING CORPORATION, UNIVERSAL FILM EXCHANGES, INC., WARNER BROS. DISTRIBUTING, AND USA FILMS, LLC | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) MAY 7, 2004 | |

**REPLY MEMORANDUM IN SUPPORT OF LIONS GATE FILMS INC.'S MOTION IN LIMINE TO EXCLUDE EVIDENCE OF ALLEGEDLY UNFAIR OR DECEPTIVE BUSINESS PRACTICES RELATING TO LIONS GATE FILMS INC.**

Defendant LIONS GATE FILMS INC. ("Lions Gate") hereby submits the following Reply Memorandum In Support of its Motion in Limine to Exclude Evidence of Any Allegedly Unfair Or Deceptive Business Practices (the "Motion").

CC491439.1
01429810011
05/07/2004 ki

## I.  INTRODUCTION

Lions Gate demonstrated in its Motion that it has not refused to license motion pictures to plaintiff Broadway Theatres Corp. ("Plaintiff") as a result of any clearances over the York Square Cinema in New Haven, Connecticut (the "York Square"), and that Lions Gate has, in fact, licensed a substantial number of its films to the York Square, both for first-run exhibition and otherwise. Lions Gate also has shown, in the case of a recent motion picture entitled *The Cooler*, both that it was prepared to license this valuable property to the York Square on a first-run basis, and that Plaintiff is far from the innocent victim of supposedly nefarious "clearances" that it portrays itself to be. Lions Gate's Motion argues that Plaintiff has produced no evidence in discovery to substantiate or support its claim against Lions Gate for alleged violation of the Connecticut Unfair Trade Practices Act ("CUTPA"). Thus, any "evidence" or arguments that Plaintiff may seek to introduce at trial to show that conduct of Lions Gate somehow amounted to a violation of CUTPA manifestly would be premised on legally erroneous concepts, be legally irrelevant, or both. Accordingly, Plaintiff should be precluded from attempting to present evidence or arguments adverse to Lions Gate at trial.

Far from refuting any of Lions Gate's evidence or arguments, Plaintiff's Opposition all but confirms each of them. Plaintiff's purported "evidence" is not evidence at all, but rather, a series of unsupported assertions, charges, grievances and innuendo, the majority of which are speculative, lacking in foundation, not based on personal knowledge and inadmissible. *See also* Defendant Lions Gate Films Inc.'s Evidentiary Objections to Declaration of Robert Spodick (filed concurrently herewith). Lions Gate has submitted credible and competent evidence to demonstrate both that it did *not* employ clearances when it declined to license specific films to the York Square and that each decision to license or not to license particular motion pictures to the York Square resulted from the prudent exercise of Lions Gate's business judgment. By contrast, the Opposition offers only unsupported, incompetent, inadmissible assertions in its ineffectual attempt to resuscitate Plaintiff's claim against Lions Gate. This Court should disregard all of Plaintiff's supposed "evidence" except to the extent that it reinforces the conclusion that Plaintiff cannot produce *any* relevant, admissible evidence that would support Plaintiff's groundless claim that Lions Gate refused to license films to the York Square based upon any "clearances."

Further, Plaintiff's various charges with respect to particular Lions Gate films are, for reasons addressed below and in the Reply Declaration of Tom Ortenberg of Lions Gate submitted herewith, as factually inaccurate as they are speculative and lacking in foundation. As Mr. Ortenberg explains, Lions Gate simply did not refuse to license any motion pictures to the York Square based upon any "clearances," including the specific pictures that Robert Spodick identifies in his uninformed, speculative declaration. Reply Declaration of Tom Ortenberg ("Ortenberg Reply Decl.") ¶¶ 2-3. Nor did Lions Gate act unreasonably or unlawfully when it declined to change its nationwide marketing and distribution plan for the motion picture *The Cooler* – which was not exhibited anywhere in Connecticut until January 16, 2004, the very day that the York Square was scheduled to begin showing this picture until it reneged on its commitment – to accommodate Plaintiff's desire to exhibit this picture during the Christmas season. *Id.* ¶¶ 6-7.

Because Plaintiff's Opposition, like Lions Gate's moving papers, demonstrates conclusively that Plaintiff cannot produce any evidence sufficient to support its claim that Lions Gate refused to license motion pictures to the York Square as a result of clearances, Lions Gate's Motion should be granted. Plaintiff simply cannot produce any competent or admissible evidence to support its baseless CUTPA claim against Lions Gate.

## II.     ARGUMENT

### A.     The Uncontroverted Evidence Establishes Conclusively That Lions Gate Did Not Engage In "Clearance" Bookings

One of the arguments advanced in the Opposition is that Lions Gate's Motion should be denied simply because Plaintiff apparently has an uninformed, misplaced belief that Lions Gate somehow engaged in "clearance" bookings with respect to three particular motion pictures: *Girl With The Pearl Earring, Monster's Ball* and *Shattered Glass.* While conceding that Lions Gate *has* licensed a substantial number of motion pictures to the York Square since 1997, Plaintiff levels the unsupported and inaccurate accusation that Lions Gate purportedly refused to license these three specific pictures to the York Square on a first-run basis due to supposed "clearances." However, Plaintiff offers no competent or admissible evidence whatsoever to support these reckless charges.

Indeed, the unfounded allegation of Plaintiff's declarant, Robert Spodick, regarding *Girl With The Pearl Earring* appears to represent nothing more than the uninformed speculation of an aggrieved competitor. *See* Declaration of Robert Spodick ("Spodick Decl.") ¶14; *see also* Opposition at 3.

By contrast, both the original Declaration of Tom Ortenberg of Lions Gate and his Reply Declaration submitted herewith – which set forth competent, admissible evidence based on personal knowledge concerning Lions Gate's practices – establish conclusively that Lions Gate did not refuse to license any motion pictures to the York Square based upon any "clearances," including, specifically, *Girl With The Pearl Earring, Monster's Ball* and *Shattered Glass*. In fact, as Mr. Ortenberg's earlier declaration stated, *Shattered Glass* is one of the numerous motion pictures that Lions Gate *has* licensed to the York Square for first-run exhibition since 1997. *See* Declaration of Tom Ortenberg in Support of Motion in Limine ("Ortenberg Decl.") ¶ 6; *see also* Ortenberg Reply Decl. ¶ 3. Moreover, as Mr. Ortenberg's Reply Declaration states, Lions Gate's decisions to license *Girl With The Pearl Earring* and *Monster's Ball* on a first-run basis "to exhibitors other than the York Square [were] based solely on Lions Gate's judgment that its business interests would be best served by licensing the films to exhibitors in the New Haven area other than the York Square." Ortenberg Reply Decl. ¶ 3. None of these three films "was a 'clearance' booking." *Id.* This evidence – which conclusively shows that these three Lions Gate pictures were not denied to the York Square based on any "clearances" – is the only relevant, admissible and competent evidence before this Court on the subject.

More generally, and also in stark contrast to Plaintiff's utter failure to produce any evidence to support its claim, Lions Gate has presented overwhelming evidence that it did not refuse to license any motion picture to the York Square as a result of any "clearance." Lions Gate has shown, and Plaintiff has not disputed the fact, that Lions Gate licensed at least twenty-five (25) films to the York Square since 1997. Further, in those instances in which Lions Gate licensed certain pictures to other exhibitors in the New Haven area, Lions Gate has shown that this decision resulted not from any supposed clearance, but from an exercise of Lions Gate's business judgment, which in turn was based on Lions Gate's motive to maximize its profits and its determination that the most advantageous

strategy for marketing and distributing those films involved granting licenses to other exhibitors in the New Haven area. *See* Ortenberg Decl. ¶ 5; Ortenberg Reply Decl. ¶ 4; *see also id.* ¶¶ 2-3, 6-8.

B. <u>Lions Gate Did Not License Films To Plaintiff That Others Rejected</u>

Plaintiff also makes the unsupported and somewhat bizarre charge that Lions Gate somehow acted unlawfully in connection with certain films that Plaintiff admits *were* exhibited at the York Square on a first-run basis because, Plaintiff asserts, these pictures were purportedly offered to other exhibitors before they were licensed to the York Square. Specifically, Plaintiff and its declarant insist, without evidentiary support, that the motion pictures entitled *Buffalo 66, Wonderland, Jesus' Son, The Big Kahuna* and *The Daytrippers* were offered to the York Square on a first-run basis only because they had been declined by the turnpike chain theatres. *See* Spodick Decl. ¶ 5. In other words, and without addressing how Plaintiff might have been damaged under such circumstances, Plaintiff seems to be suggesting – without factual or legal support – that Lions Gate's conduct with respect to these pictures somehow supports a claim under CUTPA. Plaintiff is clearly mistaken.

The Reply Declaration of Tom Ortenberg of Lions Gate reliably and conclusively establishes that Plaintiff's allegations with respect to the five referenced motion pictures are untrue. Ortenberg Reply Decl. ¶ 2. As Mr. Ortenberg states, none of the five films – *Buffalo 66, Wonderland, Jesus' Son, The Big Kahuna* and *The Daytrippers* – was a "clearance" film. Nor is Plaintiff correct in alleging that Lions Gate licensed the films to the York Square on a first-run basis only because they had been passed upon by the "turnpike" chain theatres. *Id.* To the contrary, Lions Gate decided to license each of these motion pictures to the York Square based on its business judgment that doing so would be in its best commercial interests and would maximize the potential revenues to be derived from the first-run exhibition of those films in the New Haven area. *Id.*

Moreover, even if one were to assume for the sake of argument, notwithstanding Plaintiff's failure to present any evidence indicating that this actually occurred, that Lions Gate had offered certain pictures to other exhibitors before licensing them to the York Square, such a practice would in no way support Plaintiff's claim that Lions Gate violated CUTPA by refusing to license product to the York Square based on "clearances." Even if Plaintiff could show that all of the five pictures that

it has identified were offered to the "turnpike" theatres before they were licensed to the York Square, Plaintiff's argument would not address the thirteen (13) other motion pictures that Lions Gate has licensed to Plaintiff for exhibition at the York Square on a first-run basis since 1997, including such pictures as *The Red Violin* and *Amores Perros*. Ortenberg Decl. ¶ 6. But even more fundamentally, the undisputed evidence concerning Lions Gate's licensing practices is simply inconsistent with and antithetical to a claim that it ever refused to license its product to the York Square based on "clearances". *Id.* ¶ 4. As Mr. Ortenberg states:

> . . . Lions Gate carefully formulates its marketing and distribution strategy for each motion picture that it releases for the purpose of maximizing the revenue that will be derived from the theatrical exhibition of the picture in specific markets. In the New Haven area, this calculation – and, frankly, Lions Gate's self-interest and profit motive – has led Lions Gate to conclude on numerous occasions that its business interests dictate that particular motion pictures should be licensed on a first-run basis (or otherwise) to the York Square. This is the reason why Lions Gate has licensed a substantial amount of its product to the York Square over the years. In other instances, however, Lions Gate's business judgment has led it to determine that other exhibitors in the New Haven area should receive first-run bookings of Lions Gate's films. Plaintiff is simply incorrect in jumping to the conclusion that these business decisions were the result of so-called "clearances."

*Id.*

C.  **Lions Gate Did Not Unreasonably Refuse To License *The Cooler* To The York Square**

Other portions of Plaintiff's Opposition are devoted to its attempts to defend its dishonorable conduct in connection with the motion picture *The Cooler*. These unavailing efforts accomplish nothing other than to confirm that Lions Gate offered to license this valuable film to the York Square on a first-run basis before Plaintiff reneged on the deal.[1]

---

[1]   As the Court will recall, on January 12, 2004, Plaintiff notified Lions Gate that it had decided to hold over a Twentieth Century Fox film for an additional week in lieu of honoring its commitment to Lions Gate, forcing Lions Gate to find another exhibitor in the New Haven area to

*(continue...)*

As part of its misplaced attempt to deflect attention from its repudiation of its agreement to exhibit *The Cooler* beginning on January 16, 2004, Plaintiff tries to focus instead on December 2003, complaining that Lions Gate declined to accede to Plaintiff's desire to exhibit this picture at the York Square during the Christmas season. In an apparent attempt to suggest that Lions Gate's refusal to license *The Cooler* to the York Square during the Christmas season somehow evidences an unfair or unlawful trade practice, Plaintiff speculates that Lions Gate's decision must have been based on improper motives because Mr. Spodick appears to be of the opinion that a Christmas booking could have attracted a lot of customers to his theatre. Spodick Decl. ¶ 6. Plaintiff presents no informed, reliable or admissible evidence to support its charge of an improper motive; nor does Plaintiff present any evidence to support a contention that Lions Gate's decision not to license *The Cooler* to the York Square over Christmas resulted from any "clearance." *See id.* ¶¶ 6-13.

As Tom Ortenberg of Lions Gate explains in his Reply Declaration, Plaintiff's assertions regarding *The Cooler* are totally misplaced, and clearly have nothing to do with any supposed "clearances." Indeed, Plaintiff acknowledges that Lions Gate agreed to license *The Cooler* to the York Square for exhibition on January 16, 2004 – the first date that *The Cooler* became available in the New Haven area. Moreover, as Mr. Ortenberg's Reply Declaration makes abundantly clear, Lions Gate's licensing decisions with respect to *The Cooler* flowed from a nationwide marketing and distribution strategy that it formulated and then implemented for this film. As Mr. Ortenberg states:

> . . . Lions Gate carefully formulated and implemented a nationwide marketing and distribution strategy for *The Cooler* that included distributing this film during the Christmas season solely in a limited number of selected cities and exhibiting the picture during the Christmas season in a very limited number of theatres around the country (approximately 70) that did not include any exhibitors in the New Haven metropolitan area. In fact, the distribution of *The Cooler*

---

*(continued from previous page)*

exhibit this picture on very short notice. Ortenberg Decl. ¶ 7; Ortenberg Reply Decl. ¶ 7; *see also* Spodick Decl. ¶ 9.

>during the Christmas season did not include any exhibitors in Connecticut. As a result of this nationwide marketing and distribution strategy that we established for *The Cooler* during the Christmas season, this motion picture simply was not available for exhibition in the New Haven area (or elsewhere in Connecticut) in December 2003.
>
>On January 16, 2004, as part of the next phase of Lions Gate's nationwide marketing and distribution strategy for *The Cooler*, Lions Gate expanded the nationwide distribution of *The Cooler* from approximately 70 theatres across the United States to roughly 400 theatres nationwide. It was on this date, as part of this wider nationwide release, that *The Cooler* was released in the New Haven area. Thus, the date on which Lions Gate agreed to license *The Cooler* to the York Square on a first-run basis before Plaintiff reneged on this agreement – January 16, 2004 – was the first date that *The Cooler* was available for exhibition in the New Haven metropolitan area.

Ortenberg Reply Decl. ¶¶ 6-7.

Inasmuch as Lions Gate, pursuant to its nationwide plan for this picture, did not license *The Cooler* for exhibition to any theatre in the New Haven area – or, for that matter, to any exhibitor in Connecticut – until January 16, 2004, the evidence simply cannot support Plaintiff's charge that Lions Gate's decision not to license this picture to the York Square during the Christmas season of 2003 was unreasonable or unlawful, much less the product of any purported "clearance." Lions Gate had every right to begin with the limited release that it did and thereafter expand to a much larger number of screens, including theatres in Connecticut, on January 16, 2004. *See* Ortenberg Reply Decl. ¶¶ 5-6. This licensing strategy was a proper exercise of Lions Gate's business judgment, and private actors such as Lions Gate have a clear right under the copyright laws of the United States to formulate and pursue their own business strategies as well as to choose the other parties with which they will do business. *See, e.g., Fox Film Corp. v. Doyal,* 286 U.S. 123, 127 (1932) ("The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property."); *Data General Corp. v. Grumman Systems Support Corp.,* 36 F. 3d 1147 (1st Cir. 1994) ("an author's desire to exclude others from use of its copyrighted work is a presumptively valid business justification for any immediate harm to consumers"); *see also United States v. Colgate & Co.,* 250 U.S. 300, 307 (1919) (noting, in context

of antitrust laws, that a private business has "the long recognized right ...freely to exercise his own independent discretion as to parties with whom he will deal"). While Plaintiff has the right to disagree with Lions Gate's marketing and distribution strategy and its decision not to license *The Cooler* to any theatres in the New Haven area (or, for that matter, in Connecticut) during the Christmas season of 2003, such disagreement with Lions Gate's strategy does not constitute evidence of a CUTPA violation, and cannot substitute for competent evidence sufficient to support a finding that Lions Gate engaged in the alleged conduct complained of in Plaintiff's Complaint.

Plaintiff also complains that Lions Gate allegedly has not licensed any new films to the York Square since Plaintiff reneged on its commitment with respect to *The Cooler*. While admitting that Plaintiff refused to exhibit *The Cooler* when it decided to hold over another booking from another distributor in mid-January 2004, Plaintiff suggests that Lions Gate somehow has acted improperly in purportedly declining to license other films to the York Square since January 2004. Again, to the extent that Plaintiff speculates about Lions Gate's possible motivations with respect to its licensing decisions concerning particular films, Plaintiff's assertions are wholly inaccurate, as evidenced by Mr. Ortenberg's Reply Declaration. *See* Ortenberg Reply Decl. ¶ 8.

Ultimately, however, the most relevant and salient issue regarding *The Cooler* – which the uncontroverted and overwhelming evidence in the record establishes – is that Lions Gate did not refuse to license *The Cooler* to the York Square based on any supposed "clearances." Ortenberg Reply Decl. ¶¶ 6-8. To the contrary, Lions Gate agreed to license this valuable property to the York Square on a first-run basis, and it was Plaintiff who backed out of this agreement. Ortenberg Decl. ¶ 7. To the extent that Plaintiff seeks to shift the focus to other issues, such distractions serve only to confirm the vacuousness of its case against Lions Gate, and reinforce the conclusion that Plaintiff should not be permitted to waste the time and resources of Lions Gate and this Court with the presentation of such legally erroneous and irrelevant diversions at trial.

### III.   CONCLUSION

Plaintiff has not advanced any admissible evidence that could support liability against Lions Gate for violation of CUTPA, while the evidence presented by Lions Gate in support of its Motion

demonstrates conclusively that Lions Gate did not refuse to license any motion pictures to the York Square as a result of any "clearances." As such, any purported evidence or arguments that Plaintiff may seek to present at trial for the purpose of proving that Lions Gate somehow violated CUTPA would be premised on legally erroneous concepts of liability and/or would be legally irrelevant. Accordingly, Lions Gate respectfully requests that its Motion be granted.

LIONS GATE FILMS INC.

By _____
Richard W. Bowerman (ct 04181)
Ben A. Solnit (ct00292)
Elizabeth K. Andrews (ct20986)
Tyler Cooper & Alcorn, LLP
205 Church Street
Post Office Box 1936
New Haven, Connecticut 06509

(203) 784-8400
(203) 777-1181 (fax)
e-mail: bowerman@tylercooper.com
       solnit@tylercooper.com
       eandrews@tylercooper.com

Of Counsel:

Saul D. Brenner
Kenneth S. Ingber
Loeb & Loeb LLP
10100 Santa Monica Blvd.
Suite 2200
Los Angeles, California 90067

(310) 282-2000
(310) 282-2200 (fax)
e-mail: sbrenner@loeb.com
       kingber@loeb.com

-- **Their Attorneys** --

## CERTIFICATE OF SERVICE

    This is to certify that a true and correct copy of the foregoing was hand-delivered on May 7, 2004 to the following:

Peter C. Spodick, Esquire
55 Broadway
New Haven, Connecticut 06511

                                                    Richard W. Bowerman

United States District Court
District of Connecticut
FILED AT    BRIDGEPORT
                5/7/04            20
Kevin F Rowe, Clerk
By /s/ Tiffany R. Bunulig
        Deputy Clerk

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BROADWAY THEATRE CORP. ) | |
| ) | |
| V. ) | CIVIL ACTION NO: 300-CV-00706 (SRU) |
| ) | |
| BUENA VISTA PICTURES ) | **REPLY DECLARATION OF TOM** |
| DISTRIBUTION, COLUMBIA ) | **ORTENBERG IN SUPPORT OF LIONS** |
| PICTURES INDUSTRIES, INC., ) | **GATE FILMS, INC.'S MOTION IN** |
| DREAMWORKS DISTRIBUTION ) | **LIMINE** |
| L.L.C., LIONS GATE FILMS INC., ) | |
| METRO-GOLDWYN-MAYER ) | |
| DISTRIBUTION CO., MIRAMAX FILM ) | |
| CORP., NEW LINE CINEMA ) | |
| CORPORATION, PARAMOUNT ) | |
| PICTURES CORPORATION, SONY ) | |
| PICTURES RELEASING ) | |
| CORPORATION, UNIVERSAL FILM ) | |
| EXCHANGES, INC., WARNER BROS. ) | |
| DISTRIBUTING, AND USA FILMS, ) | |
| LLC | MAY 7, 2004 |

## REPLY DECLARATION OF TOM ORTENBERG

I, Tom Ortenberg, declare and state as follows:

1. As noted in my original Declaration in support of Lions Gate's Motion in Limine in this action, I am the President of Film Releasing at Lions Gate Films Inc. ("Lions Gate"), and am personally familiar with the marketing and distribution plan for each motion picture distributed by Lions Gate. I make this Reply Declaration to address certain claims and assertions made by plaintiff Broadway Theatre Corp. ("Plaintiff") and Robert Spodick in Plaintiff's Opposition to Lions Gate's Motion in Limine. I have personal knowledge, and knowledge based upon my review of the business records of Lions Gate, of the matters set forth in this Reply Declaration. If called upon to do so, I could and would competently testify as to the matters set forth below.

**Plaintiff's Unsupported and Incorrect Claims That Certain Specific Lions Gate Films Were "Clearance" Bookings**

2. In its Opposition to Lions Gate's Motion and in the Declaration of Robert Spodick that Plaintiff has submitted in support of its Opposition, Plaintiff and Mr. Spodick have asserted, among other things, that the motion pictures entitled *Buffalo 66, Wonderland, Jesus' Son, The Big Kahuna* and *The Daytrippers* were offered to the York Square Theater in New Haven, Connecticut (the "York Square") on a first-run basis only because they had been passed upon by the turnpike chain theatres. This assertion is untrue.

In fact, Lions Gate licensed each of these motion pictures to the York Square on a first-run basis because Lions Gate determined that its business interests would be best served by booking these pictures at the York Square and that licensing these films to the York Square would result in a maximization of revenues that would be generated from the first-run exhibition of these films in the New Haven area.

3. Plaintiff also claims that the Lions Gate films entitled *Girl With The Pearl Earring*, *Monster's Ball* and *Shattered Glass* were denied to the York Square because they were "clearance" bookings. This claim is absolutely untrue. In the case of *Shattered Glass*, Lions Gate *did* license this picture to the York Square on a first-run basis. In the cases of the other two films, Lions Gate decided to grant first-run licenses to exhibitors other than the York Square based solely on Lions Gate's judgment that its business interests would be best served by licensing the films to exhibitors in the New Haven area other than the York Square. None of the referenced films was a "clearance" booking. In fact, each of the films was a limited release, and Lion's Gate determined that its business interests would be maximized if there were only one run of these films in the New Haven area.

4. More generally, I would reiterate that, contrary to Plaintiff's unsubstantiated claims, Lions Gate carefully formulates its marketing and distribution strategy for each motion picture that it releases for the purpose of maximizing the revenue that will be derived from the theatrical exhibition of the picture in specific markets. In the New Haven area, this

calculation -- and, frankly, Lions Gate's self-interest and profit motive -- has led Lions Gate to conclude on numerous occasions that its business interests dictate that particular motion pictures should be licensed on a first-run basis (or otherwise) to the York Square. This is the reason why Lions Gate has licensed a substantial amount of its product to the York Square over the years. In other instances, however, Lions Gate's business judgment has led it to determine that other exhibitors in the New Haven area should receive first-run bookings of Lions Gate's films. Plaintiff is simply incorrect in jumping to the conclusion that these business decisions were the result of so-called "clearances."

**Plaintiff's Unsupported and Incorrect Assertions Regarding *The Cooler***

5. While admitting that Lions Gate offered to license the motion picture entitled *The Cooler* to the York Square on a first-run basis in January 2004, Plaintiff complains in its Opposition and in the Spodick Declaration that Lions Gate refused to license this same motion picture to the York Square during the Christmas season of 2003.

6. Plaintiff's complaint with regard to the decision not to exhibit *The Cooler* at the York Square – or, for that matter, at any theatre in the New Haven area -- during the Christmas season, far from having anything to do with any "clearances," seems to be a complaint regarding Lions Gate's overall marketing and distribution plan for *The Cooler*. Lions Gate carefully formulated and implemented a nationwide marketing and distribution strategy for *The Cooler* that included distributing this film during the

Christmas season solely in a limited number of selected cities and exhibiting the picture during the Christmas season in a very limited number of theatres around the country (approximately 70) that did not include any exhibitors in the New Haven metropolitan area. In fact, the distribution of *The Cooler* during the Christmas season did not include any exhibitors in Connecticut. As a result of this nationwide marketing and distribution strategy that we established for *The Cooler* during the Christmas season, this motion picture simply was not available for exhibition in the New Haven area (or elsewhere in Connecticut) in December 2003.

7. On January 16, 2004, as part of the next phase of Lions Gate's nationwide marketing and distribution strategy for *The Cooler*, Lions Gate expanded the nationwide distribution of *The Cooler* from approximately 70 theatres across the United States to roughly 400 theatres nationwide. It was on this date, as part of this wider nationwide release, that *The Cooler* was released in the New Haven area. Thus, the date on which Lions Gate agreed to license *The Cooler* to the York Square on a first-run basis before Plaintiff reneged on this agreement – January 16, 2004 – was the first date that *The Cooler* was available for exhibition in the New Haven metropolitan area.

8. Plaintiff also is mistaken to the extent that he may be asserting that Lions Gate has categorically refused to consider licensing any motion pictures to the York Square since Plaintiff reneged on its agreement to exhibit *The Cooler*. Of course, one of several factors that Lions Gate considers when

making its decisions regarding whether it is in Lions Gate's best interests to license its cinematic product to particular exhibitors is the reliability of the customer. In any event, just as Lions Gate did not refuse to license pictures to the York Square based upon any "clearances" prior to January 2004, Lions Gate has not refused to license pictures to the York Square based upon any "clearances" since January 2004.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Santa Monica, California this ___5___ day of May 2004.

_____
Tom Ortenberg