UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BROADWAY THEATRE CORP. | ) | |
| | ) | |
| | ) | |
| | ) | |
| V. | ) | CIVIL ACTION NO: 3:00-CV-00706 (SRU) |
| | ) | |
| | ) | |
| | ) | |
| BUENA VISTA PICTURES | ) | |
| DISTRIBUTION, ET AL. | ) | OCTOBER 18, 2004 |

## DEFENDANTS' PROPOSED FINDINGS OF FACT

**1.    Plaintiff Broadway Theater Corp is a Connecticut Corporation formed in 1970 for the purpose of constructing and operating a movie theatre known as the York Square Cinema located at 55 Broadway, New Haven, Connecticut**

*Source:*        *Deposition of Robert Spodick – 10/31/2000 at [31:2]-[31:17].*

Page 31

| | | |
|---|---|---|
| 2 | Q | -- had?  Okay.  Then you and Mr. Sampson |
| 3 | | formed another corporation, Broadway Theatre |
| 4 | | Corp., correct? |
| 5 | A | Yes. |
| 6 | Q | When was that? |
| 7 | A | 1970. |
| 8 | Q | And was that formed for the purpose of |
| 9 | | constructing the York Square Cinemas? |
| 10 | A | And operating both. |
| 11 | Q | Both York Square and Lincoln? |
| 12 | A | No.  To build the York Square and to |
| 13 | | operate it as a theatre. |
| 14 | Q | Okay.  So Broadway Theatre Corp. was |
| 15 | | founded to build the York Square Cinemas and to |
| 16 | | operate the York Square  Cinemas? |
| 17 | A | That's right. |

2.      **Robert Spodick owns 25% of the shares of Broadway Theatre Corp.**

*Source:*        *Deposition of Robert Spodick – 10/31/2000 at [32:14]-[32:21].*

Page 32

| 14 | Q | So there are four equal owners, as I |
|----|---|--------------------------------------|
| 15 |   | understand, is that accurate? |
| 16 | A | Yes. |
| 17 | Q | And Mr. Leonard Sampson owns 25 percent |
| 18 |   | of the corporation, correct? |
| 19 | A | Yes. |
| 20 | Q | You own 25 percent of the corporation? |
| 21 | A | Yes. |

3.      **Attorney Peter Spodick graduated from law school in 1978.**

*Source:*        *Deposition of Peter Spodick 9/30/04 at [4:11]–[4:20].*

page 4

| 11 | Q. | Can you please provide us with your |
|----|----|-------------------------------------|
| 12 |    | educational background? |
| 13 | A. | BA, Long Island University; JD, Cleveland |
| 14 |    | State University. |
| 15 | Q. | When did you receive your BA? |
| 16 | A. | When? |
| 17 | Q. | Yes. |
| 18 | A. | 1969. |
| 19 | Q. | And when did you receive your JD? |
| 20 | A. | 1978. |

4.      **Peter-Michael Inc. is a Connecticut corporation formed in 1981 for the purpose of leasing and operating a movie theatre in Cheshire Connecticut known as the Cheshire Cinema. Peter Spodick is a director, President and Secretary of Peter-Michael, Inc. and Robert C. Spodick is a director and Treasurer of the corporation as well as its owner. Peter Spodick managed the Cheshire Theatre from 1981 to 1997.**

*Sources:*        *Deposition of Peter Spodick 9/30/04 at [11:16]-[12-22]; [18:7]-[18:13].*

                 *Exhibit 11*

page 11

| 16 | Q. | And for a period of 1981 through 1997 or |
|----|----|------------------------------------------|
| 17 |    | 1998, Peter-Michael, Inc. was active in operating a |

| | | |
|---|---|---|
| 18 | | theater in Cheshire; is that correct? |
| 19 | A. | That is correct. |
| 20 | Q. | And during that period of time, 1981 to |
| 21 | | 1997-98 time frame, were you the president of that |
| 22 | | company? |
| 23 | A. | During that -- I can't recall year for |
| 24 | | year, but certainly during that time there were |
| 25 | | times. I can't recall at the inception twenty |

page 12

| | | |
|---|---|---|
| 1 | | years ago whether dad was or I was something else |
| 2 | | but yes, certainly during that time. |
| 3 | Q. | So at least by 1997, you were the president |
| 4 | | of Peter-Michael, Inc., correct? |
| 5 | A. | I don't recall. But if the document says |
| 6 | | that, I believe that that's correct. |
| 7 | Q. | And Robert C. Spodick was the secretary of |
| 8 | | Peter-Michael, Inc., correct? |
| 9 | A. | I don't recall. But if the document says |
| 10 | | that, that's correct. |
| 11 | Q. | And Robert C. Spodick was a director of |
| 12 | | Peter-Michael, Inc., correct? |
| 13 | A. | Again, I don't recall, but I'm reading from |
| 14 | | the record. My recollection is not clear. |
| 15 | Q. | You don't have any information which would |
| 16 | | refute Defendant's Exhibit 9, which would indicate |
| 17 | | that Peter-Michael, Inc. is a corporation of which |
| 18 | | you were president, treasurer and director and that |
| 19 | | Robert C. Spodick was a secretary and director. |
| 20 | | You don't have any information to the |
| 21 | | contrary, do you? |
| 22 | A. | No, nothing that I can recall. |

Page 18

| | | |
|---|---|---|
| 7 | Q. | And the only business enterprise that |
| 8 | | Peter-Michael, Inc. was involved in was operating |
| 9 | | the Cheshire Cinema; is that correct? |
| 10 | A. | That's correct. |
| 11 | Q. | And who would actually manage that theater |
| 12 | | from 1981 to 1997 or whatever date it closed? |
| 13 | A. | I did. |

5.    In the late 1990's, Peter-Michael Inc. was involved in litigation with the landlord of the Cheshire Cinema. Peter-Michael Inc. retained Attorney Max Brunswick to represent it. Attorney Brunswick prevailed in a argument on behalf of Peter-Michael Inc. before the Connecticut Supreme Court. Robert Spodick attended the argument and was very impressed with Attorney Brunswick.

*Source:*        *Deposition of Peter Spodick 9/30/04 at [23:12]-[23-22]; [26:1]-[26:23].*

page 23

| 12 | Q. | Did there come a time that Cheshire theater |
| 13 | | ceased operating as a movie theater? |
| 14 | A. | Yes. |
| 15 | Q. | When was that? |
| 16 | A. | Sometime in the fall of '97 or the fall |
| 17 | | of '98. |
| 18 | Q. | Was there any litigation that resulted from |
| 19 | | the operation of the Cheshire theater in the 1990s? |
| 20 | A. | There was litigation not resulting from the |
| 21 | | operation, but there was very public litigation |
| 22 | | involving the landlord and the lease. |

page 26

| 1 | Q. | And who did Peter-Michael retain in that |
| 2 | | litigation to represent it? |
| 3 | A. | Attorney Brunswick. |
| 4 | Q. | And how did it come about that |
| 5 | | Mr. Brunswick was retained to represent |
| 6 | | Peter-Michael, Inc. in that litigation? |
| 7 | A. | Went to a family friend who was one of the |
| 8 | | partners in, I think, Wiggin & Dana, and who said |
| 9 | | that Wiggin & Dana would have great difficulty in |
| 10 | | the suit and urged me to hire Max Brunswick, that |
| 11 | | he could do a better job than they could. |
| 12 | | It's a true story, and so I called the guy |
| 13 | | without knowing him. |
| 14 | Q. | And I take it you retained him? |
| 15 | A. | Yes. |
| 16 | Q. | And was a lawsuit instituted thereafter? |
| 17 | A. | Yes. |
| 18 | Q. | Detail for me the history of that lawsuit. |
| 19 | A. | When I say lawsuit, it was a complicated |
| 20 | | matter involving a couple of years of litigation, |
| 21 | | the issue ultimately going whether the tenant could |
| 22 | | exercise his right to the en banc hearing before |
| 23 | | the Connecticut State Supreme Court. |

4

**Source:**    **Deposition of Robert Spodick 9/10/2004 at [17:19]-[18:12]; [19:12]-[20:2]; [20:15]-[20:23].**

page 17

| 19 | Q. | At some point, Mr. Max Brunswick filed an |
| 20 | | appearance for Broadway Theatre Corp., correct? |
| 21 | A. | Yes. |
| 22 | Q. | For how long have you known Mr. Brunswick? |
| 23 | A. | I met him half a dozen years ago and did |
| 24 | | not see him again until this matter. |
| 25 | Q. | And what -- |

page 18

| 1 | A. | So I don't believe it can be said that I've |
| 2 | | known him for six years. |
| 3 | Q. | That occasion six years ago when you first |
| 4 | | met him, what was that occasion? |
| 5 | A. | It was representing Peter Spodick and the |
| 6 | | Cheshire Theatre before the State Supreme Court. |
| 7 | Q. | There was litigation involving a theater in |
| 8 | | Cheshire, correct? |
| 9 | A. | Yes. |
| 10 | Q. | And do you know who the parties were to |
| 11 | | that litigation? |
| 12 | A. | Peter Spodick and others. |

page 19

| 12 | Q. | And based upon what you've testified to, |
| 13 | | there must have been some litigation and that |
| 14 | | litigation ended up in the Connecticut Supreme |
| 15 | | Court; is that correct? |
| 16 | A. | I believe it ended up square but in the |
| 17 | | process there was a hearing in Hartford, at which |
| 18 | | time I met Mr. Brunswick briefly. I was there as |
| 19 | | an interested observer. |
| 20 | Q. | You attended a hearing in Hartford; is that |
| 21 | | correct? |
| 22 | A. | Yes. |
| 23 | Q. | And was this before some court? |
| 24 | A. | The Connecticut State Supreme Court. |
| 25 | Q. | And was there an argument before that court |

page 20

| 1 | | involving matters related to the Cheshire Theatre? |
| 2 | A. | Yes. |

Page 20

| 15 | A. | By the way, I should |
| 16 | | say that the judgment from the State Supreme Court |
| 17 | | was a unanimous seven or nine-to-nothing decision |

```
18              in favor of Mr. Brunswick's argument.
19    Q.        So I assume that you were impressed with
20              Mr. Brunswick six years ago; is that correct?
21    A.        Well, I was impressed, yes, plus the fact
22              that my son in his business was using Mr. Brunswick
23              as his attorney.
```

**6.    Prior to filing suit on behalf of Broadway Theatre Corp., Attorney Spodick spoke with Attorney Brunswick about details of the case. Attorney Spodick and Attorney Brunswick have had intermittent contact over the years concerning Broadway's lawsuit. They would confer from time to time on different matters, including CUTPA.**

*Source:*        *Deposition of Peter Spodick 9/30/04 at [51:19]-[52:20].*

```
page 51
19    Q.        When was the determination made that the
20              Broadway Theatre Corp. would institute a suit
21              against Buena Vista Pictures Distribution and other
22              distributors?
23    A.        A couple of weeks before filing.
24    Q.        And who made that decision?
25    A.        That was dad.  It was Bob Spodick.
page 52
1     Q.        And did he inform you as the manager of the
2               theater that's what's going to happen?
3     A.        He informed me as Peter Spodick that's
4               something that he wanted to happen.
5     Q.        Were you involved with consulting any of
6               the attorneys that your father averred that were
7               consulted prior to bringing the lawsuit?
8     A.        No.  I believe I spoke with Max Brunswick
9               but not about moneys or fees, perhaps just details
10              of the case.
11    Q.        When did you speak with Max Brunswick prior
12              to filing the Broadway Theatre Corp. case against
13              Buena Vista Pictures Distribution and others?
14    A.        We had intermittent contact over the years.
15              No specific time.
16    Q.        When you say "intermittent contact," flesh
17              that out for me.  I don't know what you mean.
18    A.        There were occasions, none of which I can
19              pinpoint, where I have called Max Brunswick for his
20              perspectives on different matters, CUTPA.
```

7.    In addition to Attorney Max Brunswick having represented Peter-Michael, Inc., and now Broadway Theatre Corp., the law firm of Winnick, Resnick, Skolnick and Arnold has represented Broadway Theater Corp., Peter Spodick, Robert Spodick and other members of the Spodick family and their business enterprises for many years.

**Source:**    *Deposition of Peter Spodick 9/30/04 at [12:23]-[15-15].*

page 12
23   Q.    And Defendant's Exhibit 10, again, is
24         another printout taken from the Secretary of
25         State's Office, which would indicate that the agent
page 13
1          for service of process or the agent's name of
2          Peter-Michael, Inc. was Winnick, Reznick, Skolnick
3          & Arnold; is that correct?
4    A.    Is it correct that the document says that;
5          is that the question?
6    Q.    Well, you don't dispute that the document
7          says that, correct?
8    A.    No, I don't.
9    Q.    Is the information on that document
10         correct?
11   A.    I'm looking at all -- I can't testify to
12         this. The document says total shares outstanding,
13         last report 1999. I don't -- I'm not familiar with
14         those number of shares, origin regular, I don't
15         know.
16         The Winnick law firm represented the
17         Spodicks, especially dad, my brother, me at many
18         times over the years and they may very well have
19         been.
20         Do I actually know and remember that, no.
21         But I know that the document says this.
22   Q.    Who at the Winnick law firm would represent
23         you over a period of years?
24   A.    You know, they would come and go over
25         there. There were lots. Sometimes Hillel
page 14
1          Auerbach, sometimes David Skolnick, sometimes
2          Michael Perzin, sometimes Ed Winnick. There were
3          many people there.
4    Q.    And during what period of time would those
5          several attorneys at Winnick Reznick be
6          representing you?

| 7 | | Is that from 1981 through the present or |
|---|---|---|
| 8 | | was there another period of time? |
| 9 | A. | I don't know quite how to answer that. I |
| 10 | | would say during the course of my entire life if |
| 11 | | there was any kind of legal matter, it always went |
| 12 | | through that firm. |
| 13 | Q. | So is it safe to say that -- when you say |
| 14 | | during the course of your legal life, do you mean |
| 15 | | since you graduated -- |
| 16 | A. | No. My entire life. |
| 17 | Q. | You've been represented by the law firm of |
| 18 | | Winnick Reznick; is that correct? |
| 19 | A. | Yes. |
| 20 | Q. | And that law firm has had various lawyers |
| 21 | | do matters for you personally and for you in your |
| 22 | | business ventures; is that correct? |
| 23 | A. | Well, what I was saying was anything to the |
| 24 | | best of my recollection relating to the Spodick |
| 25 | | family, brother, sisters, parents. I don't recall |

page 15

| 1 | | any lawyers from any other law firm during my |
|---|---|---|
| 2 | | entire life except for lawyers who have been from |
| 3 | | that particular law firm. |
| 4 | Q. | And they would represent you both for |
| 5 | | personal matters and for businesses with which you |
| 6 | | were involved? |
| 7 | A. | No. I'm speaking -- the family, yes, and |
| 8 | | me, Peter, yes. There have been other lawyers. |
| 9 | | Max Brunswick was retained to represent the |
| 10 | | Cheshire Cinema in a matter and -- I don't know |
| 11 | | quite how to answer that. There may have been |
| 12 | | other lawyers I can't pinpoint right now for some |
| 13 | | matter or another. |
| 14 | | But to the best of my knowledge, generally |
| 15 | | speaking, the Winnicks have represented the family. |

**Source:**   *Deposition of Robert Spodick 9/10/2004 at [13:3]-[13:9].*

page 13

| 3 | Q. | Okay. That's what I'm directing at. |
|---|---|---|
| 4 | | Who has it retained? What attorney has |
| 5 | | represented Broadway Theatre in its history? |
| 6 | A. | Edward Winnick. |
| 7 | Q. | Was he its only attorney that you can |
| 8 | | recall? |
| 9 | A. | Essentially exclusively, yes. |

8

8.  **Cheshire Cinema ceased operations in 1997 and Peter Spodick became the
    the manager and operator of York Square Cinema.**

*Source:*          ***Deposition of Robert Spodick 9/10/2004 [8:21] - [9:7];
                   Affidavit of Robert Spodick dated August 11, 2004, ¶7.***

page 8
21    Q.    Directing your attention to Paragraph 7 of
22          your affidavit, it states, quote, As a result, my
23          son Peter C. Spodick, who works 70 to 80 hours a
24          week managing the York Square just to keep it open
25          and is also a licensed attorney, agreed to bring
page 9
1           the action.
2           Did I read that correctly, sir?
3     A.    Yes.
4     Q.    For what period of time has your son Peter
5           C. Spodick worked 70 to 80 hours a week managing
6           the York Square?
7     A.    I believe since 1997, approximately.

*Source:*          ***Deposition of Peter Spodick 9/30/04 at [41:21]-[42-14].***

page 41
21    Q.    Paragraph 4 of your affidavit, which is in
22          front of you, states, "I am also the manager and
23          operator of the York Square Theatre owned by
24          Broadway."
25          Do you see that, sir?
page 42
1     A.    Yes.
2     Q.    Is there a difference between being a
3           manager or an operator?
4     A.    I think it's just an attempt to be
5           comprehensive, the guy who runs things at the
6           theater.
7     Q.    You are the person who runs the York
8           Square, is that what you're intending that to mean?
9     A.    I'm the guy if something goes wrong who
10          gets the call.
11    Q.    When did you become manager of the York
12          Square?
13    A.    When Arnie left. '96/'97/'98.  I can't
14          recall.

9.    **Charles Francis is an attorney admitted to practice in Connecticut. Attorney Francis was a law school classmate of Peter Spodick, a business partner with Peter Spodick's brother, Michael Spodick, and a close friend of the entire Spodick family for many years. Peter Spodick showed Charles Francis a copy of Broadway Theatre Corp's complaint prior to instituting suit and has conferred with him about plaintiff's case over the course of this litigation. Charles Francis accompanied Peter Spodick to court on May 10, 2004 and conferred with Peter and Robert Spodick.**

*Source:*        *Deposition of Peter Spodick 9/30/2004 at[57:5]-[58:20].*

page 57

| | | |
|---|---|---|
| 5 | Q. | Did you show it to any attorney? |
| 6 | A. | Yes. |
| 7 | Q. | And to whom did you show it? |
| 8 | A. | Charles Francis. |
| 9 | Q. | Any attorney other than Mr. Francis that |
| 10 | | you can presently recall? |
| 11 | A. | I don't believe so. |
| 12 | Q. | Who is Mr. Charles Francis? |
| 13 | A. | An old friend, classmate, lawyer. |
| 14 | Q. | Your father testified that he was a |
| 15 | | classmate of yours at law school; is that correct? |
| 16 | A. | Yes. |
| 17 | Q. | And that he has been a very close friend of |
| 18 | | yours since that period of time; is that correct? |
| 19 | A. | Yes. |
| 20 | Q. | And has he also been a close friend of the |
| 21 | | family's? |
| 22 | A. | Yes. |
| 23 | Q. | And continues to be a close friend to this |
| 24 | | day; is that correct? |
| 25 | A. | Yes. |

page 58

| | | |
|---|---|---|
| 1 | Q. | So you've known him since -- |
| 2 | A. | '75. |
| 3 | Q. | 1975. |
| 4 | | Have you ever been involved in any business |
| 5 | | enterprise with Mr. Francis? |
| 6 | A. | Charles had some involvement with my |
| 7 | | brother that would peripherally matter to me, but I |
| 8 | | don't think that I was actually involved with him |
| 9 | | in the Whalley Theatre. |
| 10 | | Again, it's 20-something years ago. He was |
| 11 | | around a lot, but I don't think that I was |
| 12 | | literally involved with him doing business. |
| 13 | Q. | You believe that Mr. Francis might have |

| 14 |    | been involved with your brother Michael in one of |
|----|----|---------------------------------------------------|
| 15 |    | your brother Michael's theaters? |
| 16 | A. | Yes, the details of which I'm not |
| 17 |    | testifying to. |
| 18 | Q. | And when you say he was around a lot, do |
| 19 |    | you mean in New Haven? |
| 20 | A. | Yes.  He lived in New Haven, yes. |

**Source:**     ***Deposition of Robert Spodick 9/10/2004 at [49:8]-[49:19].***

page 49

| 8  | Q. | Had you ever met Charles Francis prior to |
|----|----|-------------------------------------------|
| 9  |    | Monday, May 10th? |
| 10 | A. | Yes. |
| 11 | Q. | And when have you met him? |
| 12 | A. | I think it was in the late 1970s in |
| 13 |    | Cleveland when Peter graduated from the John |
| 14 |    | Marshall Law School.  I believe Charles Francis was |
| 15 |    | in the same class. |
| 16 | Q. | That was the first occasion you had to meet |
| 17 |    | Mr. Francis? |
| 18 | A. | As I recall since that time, I've seen a |
| 19 |    | lot of him. |

**Source:**     ***Deposition of Peter Spodick 9/30/2004 at[59:6]-[59:15];***
***[60:5]-[60:10]; [61-14]-[16-16]; [66:14]-[66-19].***

page 59

| 6  | Q. | Was Mr. Francis ever admitted to practice |
|----|----|-------------------------------------------|
| 7  |    | law in Connecticut? |
| 8  | A. | Yes. |
| 9  | Q. | And did he ever practice law in |
| 10 |    | Connecticut? |
| 11 | A. | I don't know -- I don't believe he |
| 12 |    | practiced.  He was admitted to practice here. |
| 13 | Q. | Where is Mr. Francis today? |
| 14 | A. | He's in an LOM program, in international |
| 15 |    | law at the university of Indiana. |

page 60

| 5  | Q. | I take it you still maintain a close |
|----|----|--------------------------------------|
| 6  |    | relationship with Mr. Francis; is that correct? |
| 7  | A. | Yes. |
| 8  | Q. | How frequently do you speak with him? |
| 9  | A. | Regularly, every week. |
| 10 | Q. | At least once a week. |

page 61

| 14 | Q. | Mr. Francis was with you in court on May |
| 15 | 1  | 10, 2004, correct? |
| 16 | A. | Yes. |

page 66

| 14 | Q. | Had you discussed the case with Charles |
| 15 |    | prior to Monday morning? |
| 16 | A. | Many times. |
| 17 | Q. | And had he advised you over the course of |
| 18 |    | the years with regard to the trial? |
| 19 | A. | Yes. |

**10.    Robert Spodick's deposition occurred over the course of three days.  Robert Spodick was first deposed on October 31, 2000. By agreement of the parties, the deposition had to be continued until December 7, 2000 in order to permit the plaintiff time to produce documents which it had failed to produce at the deposition and in order to permit Robert Spodick to visit a family member in Hong Kong.**

*Source:*        *Deposition of Robert Spodick 10/31/2000 at [10:19]-[12:5].*

page 10

18 BY MR. BOWERMAN:

| 19 | Q | The Notice of Deposition of Broadway |
| 20 |   | Theatre Corp. requested that certain documents be |
| 21 |   | produced today. |
| 22 | A | Yes. |
| 23 | Q | Am I correct in assuming that Broadway |
| 24 |   | Theatre is in the process of putting those |

page 11

| 1  |   | documents together? |
| 2  | A | Yes.  It was in process, and |
| 3  |   | unfortunately, unknown to us, Mrs. Goodmaster, who |
| 4  |   | is the only person in that office, had sudden |
| 5  |   | unanticipated surgery.  She will complete the |
| 6  |   | process and I hope be able to get it to us to give |
| 7  |   | to you as soon as possible. |
| 8  | Q | Fine.  Now, I understand that, and |
| 9  |   | Defendant's Exhibit 2, which is a letter to me |
| 10 |   | from your attorney, outlines that, in fact, she |
| 11 |   | has attempted to put together those documents, and |
| 12 |   | her inability to do so now.  What I'm proposing is |
| 13 |   | that we'll go as far as we can today, and then |
| 14 |   | we'll have to continue the deposition, give her |
| 15 |   | some other time to get these documents, and then |

16          proceed with further examination on those.  Is
17          that okay with you, Mr. Spodick?
18    A     I recognize that, too.
19          MR. PETER SPODICK:  Yes, there is --
20          if I understand correctly, you have a long
21          planned trip.
22          THE DEPONENT:  Oh, yes.
23          MR. PETER SPODICK:  Can you put that
24          on the record, please?
page 12
1           THE DEPONENT:  I will be unavailable
2           between November 11th and November 28th.
3           MR. BOWERMAN:  Okay.
4           THE DEPONENT:  We're going to visit
5           our son overseas.

**11.    Robert Spodick's deposition was continued until December 7, 2000. Days prior to December 7th, the defendants picked up at the office of the plaintiff's bookkeeper, Edith Goodmaster, thousands of papers of original documents, copies of which were to have been produced in October. The documents had not been reviewed by Attorney Spodick prior to being produced by Mrs. Goodmaster to the defendants. The defendants had the documents copied. The second day of Robert Spodick's deposition was continued by agreement of the parties in order to permit Attorney Spodick the opportunity to review the documents Mrs. Goodmaster had produced, as well as to permit review by Robert Spodick, who had recently returned from a trip overseas.**

*Source:*        ***Deposition of Robert Spodick 12/7/2000 [169:6]-[170:19]***

page 169
5  DIRECT EXAMINATION
6  BY MR. BOWERMAN:
7     Q     Good morning, Mr. Spodick.  This is the
8           continuation of your deposition which began on
9           October 31st.
10          MR. BOWERMAN: In the interim, just for
11          the record, last Friday we received four
12          box loads of documents, which we had copied
13          over the weekend and we'll return to you
14          today.  How do you wish to proceed with
15          that.
16          MR. SPODICK: We'll send a kid.
17          Someone with a cart will haul those things
18          out.
19          MR. BOWERMAN: Okay, they're available,

20      so if you wanted to do that, we'll have
21      them for you.
22      MR. SPODICK: It wouldn't be today.
23      MR. BOWERMAN: It will not be today.
24      MR. SPODICK: I don't think we'll be
page 170
1       able to reach anybody today.  Tomorrow.
2       Will that be troubling?
3       MR. BOWERMAN: My only concern is they
4       were original documents and I just want to
5       make sure they get back to you in a timely
6       fashion before anything untoward happens.
7       Not that I anticipate that, but that always
8       does.
9       MR. SPODICK: I prefer not to haul
10      stuff out myself.
11      MR. BOWERMAN: No, I'm okay with that.
12      I just want you to know they're available
13      today.  And I don't want them misplaced, of
14      course.  But if you need someone from our
15      outfit to take them up today, as long as
16      there's someone there to deliver to.  I
17      don't know where you want them delivered.
18      MR. SPODICK: Let's see how we are with
19      time today.


**Source:**    **Deposition of Robert Spodick, 12/7/2000[329:21]-[334:12]**

page 329
21      MR. BOWERMAN: Maybe just, again on the
22      record, we should do this.  I understand
23      you haven't had a chance to really look at
24      the stuff you produced, so you're not sure
page 330
1       as you sit here what you did produce, am I
2       correct.
3       MR. SPODICK: That is correct.
4       MR. BOWERMAN: Should we, for today's
5       purposes, I'm going to return to you or
6       provide for you those documents, because I
7       have had them copied and I don't need to
8       keep the originals, and prefer that you
9       have the originals, permit you to review
10      those, go back over the documents that we
11      have a question on, because I don't

12    believe, I may be wrong, but I don't
13    believe that they -- that which has been
14    produced would include all that has been
15    requested. And if we could reconvene again
16    shortly, in the next few days, with all the
17    documents, we can conclude this
18    deposition. Unless you can figure out a
19    better way to proceed for today's purposes.
20        MR. SPODICK: No, I'd like to review.
21    Once again, these were -- the subpoena was
22    served upon the bookkeeper. She -- to put
23    these things together. All of the records
24    and statements, I believe, letters,

page 331

1    whatever they may be, I believe are
2    essentially within her control, if not
3    exclusive control. And that when our guy
4    picked these materials up, my impression
5    was that whatever it was that was going to
6    be sought, was there. I came across this
7    letter from this morning, and looking at
8    this again, this in fact is also off of her
9    word processor. For instance, if that were
10    not, as an example, included within this,
11    that would be something that she would have
12    had. I brought that for review, and then
13    in the event you didn't have it, I thought
14    that it was relevant for this morning. I
15    can go back to her and walk through.
16        MR. BOWERMAN: I'm just wondering
17    whether, you know, I think we're infinitely
18    closer to the end than the beginning, but
19    to make this -- to satisfy you that in fact
20    you have more knowledge than you do as you
21    sit here, what has been produced, and that
22    that --
23        THE DEPONENT: That is a typical day's
24    box office statements.

page 332

1        MR. BOWERMAN: And that that complies
2    with everything that's been requested. We
3    have to do that before we conclude, and I
4    don't think you're going to be able to do
5    that absent the ability to do that. Should
6    we conclude for the day, reconvene sometime
7    very shortly, hopefully not too much

8     longer, unless you can come up with a
9     better solution.
10    MR. SPODICK: No, that's -- my
11    conversation with her on Friday, when I
12    spoke with her about having these things
13    delivered, I asked her "How voluminous is
14    all of this," she said it will be some
15    thousands of pages.
16    MR. BOWERMAN: I don't doubt for a
17    minute that she produced thousands of
18    pages. But I'm not sure she produced all
19    that has been requested. I didn't --
20    again, it's only cursory.
21    MR. SPODICK: And I put the question to
22    her, I mean "Is this substantial
23    compliance." And she said she was very
24    sure.

page 333

1     MR. BOWERMAN: I would just suggest
2     that you take the opportunity to -- we'll
3     get these documents back to you, so you
4     know what has been produced, go over
5     Schedule A, reviewing that which has been
6     requested, and then we'll be able to
7     confirm when we reconvene that all that you
8     have has in fact been produced. Then we
9     can conclude.
10    MR. SPODICK: Also, I should say, again
11    for the record, that for most of this --
12    most of these past four weeks, Robert
13    Spodick has been away and unable to -- in
14    fact, I think he just returned on Friday
15    morning.
16    THE DEPONENT: I didn't want to delay
17    getting these things to you.
18    MR. BOWERMAN: Oh, I have no problem
19    with that.
20    THE DEPONENT: Plus the fact, prior to
21    it, this woman had undergone surgery.
22    MR. BOWERMAN: I think that has been
23    established already. What this suggests to
24    me is that we should, for today's purposes,

page 334

2     cease for today, do that review, and then
3     reconvene. We should probably set up a
4     date now, otherwise it just gets very
5     difficult getting in touch with each other,

16

```
5        and then -- unless you have a better way to
6        proceed.
7        MR. SPODICK: No, that's fine.  Is next
8        week all right?
9        MR. BOWERMAN: Let me get my calendar.
10       (DISCUSSION HELD OFF THE RECORD.)
11       (WHEREUPON, the deposition was
12       adjourned at 3:30 p.m.)
```

12.    The third and final day of Robert Spodick's deposition in the plaintiff's case in chief went forward on December 14, 2000. The transcript for this date is 197 pages, 97 pages of which constitutes cross-examination by Attorney Peter Spodick of Robert Spodick. At no time during the three days that Robert Spodick was deposed did he or Attorney Peter Spodick object to the method or manner of the deposition or suggest that the taking of Robert Spodick's deposition was having any adverse effect upon the health or safety of the deponent. Robert Spodick's deposition was continued on each occasion by agreement of the parties either to permit the plaintiff additional time to produce documents or, for the documents that had been produced, to be reviewed by Attorney Spodick and Robert Spodick.

*Source:*    *Deposition of Robert Spodick 12/14/2000*

13.    On December 9, 2003, the parties appeared before Judge Underhill at a scheduling call. A trial date of May 10, 2004 was ordered and agreed to by the parties.

*Source:*    *Judicial notice*

14.    On January 15, 2004, Attorney Sara V. Spodick, of Reiner, Reiner & Bendett, P.C., filed an appearance on behalf of the plaintiff. On February 19, 2004, Attorney Sara V. Spodick moved for an order removing her and Reiner, Reiner & Bendett, P.C. as attorney of record for the plaintiff. The motion was granted on February 23, 2004.

*Sources:*    *Appearance of Attorney Sara V. Spodick;*
             *Motion For Withdrawal dated February 19, 2004.*

**15.    Robert Spodick was admitted to the Milford Hospital on or about April 28, 2004 with a suspicion of pneumonia. He was discharged a day later. In fact, Robert Spodick did not have pneumonia and within a week of his discharge had resumed his normal activities.**

*Source:*        *Deposition of Robert Spodick 9/10/2004 at [70:4]-[71:12]; [71:22]-[71:24]; [73:9]-[73:21]*

page 70

| | | |
|---|---|---|
| 4 | Q. | I want to direct your attention quickly to |
| 5 | | just a few questions. |
| 6 | | In April of '04, were you admitted to a |
| 7 | | hospital? |
| 8 | A. | Yes. |
| 9 | Q. | What hospital? |
| 10 | A. | Milford Hospital. |
| 11 | Q. | And how did you get to Milford Hospital? |
| 12 | A. | By ambulance. |
| 13 | Q. | And for how long were you admitted at the |
| 14 | | hospital? |
| 15 | A. | Two days. |
| 16 | Q. | Do you know what you were diagnosed with, |
| 17 | | why you went to the hospital? |
| 18 | A. | Suspicion of pneumonia. |
| 19 | Q. | You went to the hospital, I believe, |
| 20 | | according to your affidavit, on April 28, 2004? |
| 21 | A. | Did I specify that? |
| 22 | Q. | Well, perhaps you didn't specify the date. |
| 23 | | Look at Paragraph 16 of your affidavit which reads |
| 24 | | in part that you've been "released from the |
| 25 | | hospital twelve days before the May 10th court |

page 71

| | | |
|---|---|---|
| 1 | | appearance." |
| 2 | | Do you see that? |
| 3 | A. | Yes. |
| 4 | Q. | And my calculation makes that around April |
| 5 | | 28th. Okay. |
| 6 | | So if you're admitted on April 28th, were |
| 7 | | you discharged on April 29th? |
| 8 | A. | A day later. |
| 9 | Q. | And when you were discharged or released, |
| 10 | | do you know whether they had made a diagnosis that |
| 11 | | you had pneumonia? |
| 12 | A. | No.  They had a diagnosis that I was okay. |

page 71

| 22 | Q. | So as it turned out, you didn't have |
| 23 |    | pneumonia? |
| 24 | A. | Did not. |

page 73

| 9  | Q. | And how did you feel once you were |
| 10 |    | discharged from the hospital? |
| 11 | A. | Sort of weak but sort of normal. |
| 12 | Q. | And did there come a time when you started |
| 13 |    | to drive again after your discharge from the |
| 14 |    | hospital? |
| 15 | A. | Yes. |
| 16 | Q. | And when was that? |
| 17 | A. | Toward the end of that week. |
| 18 | Q. | And by the end of that week, were you |
| 19 |    | feeling, for lack of a better phrase, normal again |
| 20 |    | or back to your regular state of health? |
| 21 | A. | Yes, whatever it was. |

**Source:**    *Deposition of Peter Spodick 9/30/2004 at[38:8]-[39:14].*

page 38

| 8  | Q. | In fact, your father didn't have pneumonia, |
| 9  |    | did he? |
| 10 | A. | He had, I think, severe bronchitis, and in |
| 11 |    | an 84-year-old guy, concerns about pneumonia |
| 12 |    | following on its heels, something like that. I |
| 13 |    | haven't seen medical reports. You may know more |
| 14 |    | than I do. |
| 15 | Q. | Well, your father testified when he was |
| 16 |    | deposed in this a week or two ago that he did not |
| 17 |    | have pneumonia, he was not diagnosed with |
| 18 |    | pneumonia? |
| 19 | A. | I haven't seen his deposition. I wasn't |
| 20 |    | present. |
| 21 | Q. | I understand that. |
| 22 |    | Do you have any information that in fact |
| 23 |    | your father had pneumonia in April of 2004? |
| 24 | A. | Suspicion of pneumonia. I hadn't seen my |
| 25 |    | father for two weeks before that, home |

page 39

| 1 |    | recuperating. The details I don't know. I have |
| 2 |    | not seen the medical reports. |
| 3 |    | The call I got from the hospital was it |
| 4 |    | looks like dad has pneumonia. |
| 5 | Q. | And do you know that your dad was |

| | | |
|---|---|---|
| 6 | | discharged the day after he was admitted to the |
| 7 | | hospital? |
| 8 | A. | I knew he was discharged shortly afterward. |
| 9 | Q. | Did you visit your father in the hospital? |
| 10 | A. | No. |
| 11 | Q. | So when your father testified that he was |
| 12 | | discharged the day after he was admitted, you don't |
| 13 | | have any information to the contrary, do you? |
| 14 | A. | I have no information about it whatsoever. |

**16.**    **On Thursday, May 6, 2004, the parties appeared before Judge Underhill for a pretrial conference concerning what claims were being pressed at trial, what damages were being sought and what witnesses would be called. At the conference Attorney Spodick stated that he would not be appearing as a witness, and therefore the pending motion in limine on that issue was moot. Attorney Spodick further stated that his expert, Ronald Wanless, would not be testifying, and therefore the pending motion in limine on that issue was also moot. Attorney Spodick further stated that the pending motion in limine concerning his damages expert, Michael Bailey, would have to be argued, although he conceded that Michael Bailey might not be able to testify about what would have been the plaintiff's receipts during the period of years within the statute of limitations.**

*Source:*    *Transcript of proceedings before Judge Underhill, May 6, 2004.*

Page 30

| | |
|---|---|
| 6 | MR. SPODICK: We've met over the past couple of |
| 7 | days with an eye toward what you were regarding as |
| 8 | streamlining. If we're through the names now, I, |
| 9 | Peter Spodick will not be a witness. |
| 10 | THE COURT: All right, So it's unnecessary in |
| 11 | that case to rule on the motion. |
| 12 | MR. SPODICK: That motion, correct. |
| 13 | THE COURT: That motion in limine. Okay, thank |
| 14 | you. But let's also go over who is going to be a witness. |

Page 39

| | |
|---|---|
| 8 | THE COURT: Okay. All right, Mr. Wanless, |
| 9 | W-A-N-L-E-S-S? |
| 10 | MR. SPODICK: Extremely ill, terminal. He |
| 11 | cannot testify under any circumstances. |
| 12 | THE COURT: All right, so you're not going to |
| 13 | call Wanless? |
| 14 | MR. SPODICK: No. |
| 15 | THE COURT: Okay. There was a motion in limine |
| 16 | possibly regarding Wanless so that's now moot, is that |
| 17 | correct? |

| | |
|---|---|
| 18 | MR. SPODICK: Yes, Yes. |
| 19 | THE COURT: Okay. Michael Bailey |
| 20 | MR. SPODICK: He's the accountant for a member |
| 21 | of the accounting firm that keeps the accounts for the |
| 22 | theater, for the Broadway, plaintiff Broadway Theater |
| 23 | Corporation. |
| 24 | THE COURT: And he's a damages witness? |
| 25 | MR. SPODICK: Yes, he is. I believe that there |

Page 40

| | |
|---|---|
| 1 | is a motion in limine relating to Michael Bailey also, |
| 2 | Your Honor. |
| 3 | THE COURT: And more specifically, what is he |
| 4 | going to testify about? |
| 5. | MR. SPODICK: The relative income of the theater |
| 6 | over a period of years and what the projected business |
| 7 | grosses should be in the absence of the alleged behaviors |
| 8 | by the defendants. |
| 9 | THE COURT: And how, how is he going to testify |
| 10 | about what the receipts should have been? |
| 11 | MR. SPODICK: I don't know if he'll be able to. |

**17.**    **At the May 6, 2004 conference before Judge Underhill, Attorney Spodick stated that Robert Spodick would be called as plaintiff's first witness. Attorney Spodick informed the court that although Robert Spodick had a hearing disability, there is no difficulty with Robert Spodick's comprehension. When Attorney Spodick stated that Robert Spodick may require something in the way of either a protective order or understanding the Court urged the parties to take deposition testimony and submit it in lieu of live testimony or submit direct testimony by affidavit. Attorney Spodick did not raise any other concerns about Robert Spodick's current state of health.**

*Source:*    ***Transcript of proceedings before Judge Underhill, May 6, 2004.***

Page 51

| | |
|---|---|
| 10 | THE COURT: Okay. Who are you going to call as |
| 11 | your first witness? |
| 12 | MR. SPODICK: Robert Spodick. |
| 13 | THE COURT: How long do you anticipate his |
| 14 | direct testimony will last? |
| 15 | MR. SPODICK: Thank you. It will be lengthy |
| 16 | testimony with direct and cross examination. He is 84 |
| 17 | years old and may require something in the way of either |
| 18 | protective order or understanding. He has a hearing |
| 19 | disability and his voice is no -- he had cancer surgery, |
| 20 | his voice is not the best. It may be very slow going. |

21.         There's no difficulty with his comprehension or anything
22          like that, but the deposition was for three days and I
23          could see his testimony going more than a day.
24          THE COURT: Well, that brings up another topic.
25          In a bench trial I urge the parties to, when they can, to
Page 52
1           take deposition testimony and submit it in lieu of live
2           testimony, and I'll permit you to highlight. Plaintiff
3           can highlight in yellow and the defense can highlight in
4           orange or whatever, and I'll see what each of you will be
5           doing, so consider whether that might, especially with a
6           witness who has some physical limitations on his ability
7           to testify, may be a more efficient for me than it
8           is for me to hear.
9           MR. SPODICK: I think that – thank you, Your
10          Honor. I think that he would be particularly anxious to
11          testify and –
12          THE COURT: Well, you can do this in part. In
13          other words, if you want to have him testify for a short
14          bit, just to show how concerned he is, interested he is,
15          emphasize a few points, and then submit the bulk of his
16          testimony by way of transcript, that's an option as well.
17          To seems to me a little bit of a waste of time
18          if the man has some physical limitations to spend, for
19          example, two or three days with him when we could spend
20          usefully two or three hours with him and there would be
21          the transcript.


Page 58
7           Mr. BOWERMAN: What about affidavit? You
8           mentioned something about direct by affidavit? We're
9           obvious going to want some live witnesses but –
10          THE COURT: Right. If you have a witness –
11          again I'm going to ask the two of you to confer, but if
12          you want to put in an affidavit have some the person be
13          available for cross, that's fine.

Page 59
20          THE COURT: Any objection, Mr. Spodick,
21          proceeding in that way?
22          MR. SPODICK: No.

18.     On Friday, May 7, 2004, the defendants took the deposition of one of plaintiff's proposed witnesses, Wayne David Heaton. Attorney Peter Spodick was present during the deposition. Following the deposition, Attorney Bowerman and Attorney Spodick discussed exchange of exhibits and exchange of highlighted portions of deposition testimony the parties intended to offer.

*Source:*     *Deposition of Peter Spodick 9/30/2004 at[77:8]-[79:3].*
              *Declaration of Richard W. Bowerman, Exhibit 1, at ¶ 5*

page 77

| | | |
|---|---|---|
| 8 | Q. | Do you recall after the deposition of David |
| 9 | | Heaton on Friday, May 7th, that we had our exhibits |
| 10 | | prepared and that you had not had them prepared but |
| 11 | | we were going to exchange -- have a mutual exchange |
| 12 | | once you had yours prepared; do you recall that? |
| 13 | A. | Yes. We were to get together over the |
| 14 | | weekend. I think that I -- if I recall correctly, |
| 15 | | I made a call on -- I think it was Sunday and I |
| 16 | | believe that I spoke with Liz Andrews, and I |
| 17 | | believe -- it may not be, but I believe, if I |
| 18 | | recall correctly, that she was at work in the |
| 19 | | office on the weekend and was for some reason |
| 20 | | unable to get together over the weekend, something. |
| 21 | Q. | Putting aside that conversation which we'll |
| 22 | | get to in a minute, do you recall on Friday when |
| 23 | | you and I had a conversation actually in the |
| 24 | | presence of Mr. Heaton, even though his deposition |
| 25 | | had concluded because he hadn't left yet, in fact |

page 78

| | | |
|---|---|---|
| 1 | | you recall leaving the building with him? |
| 2 | A. | I don't recall. |
| 3 | Q. | And we discussed designating your father's |
| 4 | | deposition. |
| 5 | A. | I do recall. Forgive me. Yes. |
| 6 | Q. | We discussed the defendants were going to |
| 7 | | use green and that you use some other color, and |
| 8 | | then we also discussed a mutual exchange of |
| 9 | | exhibits and that you said we would talk about that |
| 10 | | later and we'd speak later in the day, and I |
| 11 | | believe the deposition concluded somewhere very |
| 12 | | early afternoon. |
| 13 | | Does that comport with your recollection? |
| 14 | A. | Concerning highlighting. Concerning the |
| 15 | | weekend I recall, and there was conversation over |
| 16 | | the weekend, which I recall very specifically. |
| 17 | Q. | I just want to stick to the Friday one |

| 18 | first. We'll go day by day. |
| 19 | By Friday, following the Heaton deposition, |
| 20 | you and I discussed designating your father's |
| 21 | deposition, highlighting it in different colors. |
| 22 | The defendants were going to use green. We were |
| 23 | preparing our witness -- our exhibit list, rather, |
| 24 | and that you hadn't prepared yours yet but once you |
| 25 | had we were going to exchange them at the same |

page 79

| 1 | time. |
| 2 | Do you recall that? |
| 3 | A. Yes, approximately, yes. |

**19.    Prior to Monday morning, May 10, 2004, Attorney Peter Spodick had not seen Robert Spodick since before April 28, 2004, and at no time between the May 6th pretrial conference before Judge Underhill and Monday morning, May 10th, did Attorney Spodick do anything to prepare Robert Spodick as a witness.**

*Source:*    *Deposition of Peter Spodick 9/30/2004 at [40:24]-[41:20]; [72:9]-[72:15]; [117:3]-[117:6].*

page 40

| 24 | Q. | You testified that you had not seen your |
| 25 | | father for two weeks prior to May 10th; is that |

page 41

| 1 | | correct? |
| 2 | A. | About. I don't believe that I saw Bob at |
| 3 | | all -- dad at all before the weekend that he became |
| 4 | | sick until May 10th. |
| 5 | Q. | Your affidavit in this matter is Exhibit 3, |
| 6 | | and in Paragraph 14, you indicate that on May 10, |
| 7 | | 2004 when this case was scheduled to commence |
| 8 | | trial, my father had just been released from the |
| 9 | | hospital twelve days earlier on April 28, 2004; is |
| 10 | | that accurate? |
| 11 | A. | That Paragraph 14 says that? I haven't |
| 12 | | looked. |
| 13 | | Yes. |
| 14 | Q. | And if he's released on April 28th, you had |
| 15 | | not seen your father from the time period of April |
| 16 | | 28, 2004 until the morning of May 10, 2004; is that |
| 17 | | correct? |
| 18 | A. | I believe that's correct. I don't recall |
| 19 | | seeing him at all. He was not at work. I don't |
| 20 | | think I saw him at all during that time frame. |

page 72

| | | |
|---|---|---|
| 9 | Q. | My question was: When is the last time you |
| 10 | | saw him prior to April 27, 2004? |
| 11 | A. | When was the last time I saw him prior to |
| 12 | | April 27th? |
| 13 | Q. | Correct. |
| 14 | A. | I don't recall. |
| 15 | Q. | And you hadn't seen him from April 27th |
| 16 | | until Monday morning May 10, 2004, right? |
| 17 | A. | That's correct. |

page 117

| | | |
|---|---|---|
| 3 | Q. | Did you do anything from May 6, 2004 up to |
| 4 | | the morning of May 10, 2004 to prepare your father, |
| 5 | | Robert Spodick, to be a witness? |
| 6 | A. | No. |

**Source:**    ***Deposition of Robert Spodick 9100/2004 at [52:3-[52:7]; [53:1]-[53:12]***

Page 52

| | | |
|---|---|---|
| 3 | Q. | I take it at least from the time period of |
| 4 | | May 6, 2004 up to Monday morning, May 10th, you did |
| 5 | | not prepare with Peter Spodick to testify on May |
| 6 | | 10th; is that correct? |
| 7 | A. | Yes. |

page 53

| | | |
|---|---|---|
| 1 | Q. | And as you walked into court that morning, |
| 2 | | Monday, May 10th, you weren't sure whether you were |
| 3 | | going to be a witness that day, were you? |
| 4 | A. | No, I wasn't. |
| 5 | Q. | No, you were not sure? |
| 6 | A. | Yes. |
| 7 | Q. | And it was your understanding as you walked |
| 8 | | into court maybe I'd be a witness, maybe I |
| 9 | | wouldn't. You just didn't know; is that accurate? |
| 10 | A. | Yes. |
| 11 | Q. | Yes, that is accurate? |
| 12 | A. | Yes, that is accurate. |

**20.    Attorney Spodick called Attorney Bowerman on Sunday, May 9, 2004, and stated that he would meet with Attorney Bowerman before the opening of court Monday morning and exchange exhibits. Attorney Spodick further informed Attorney Bowerman that he would be faxing him written settlement offers directed to each defendant later Sunday evening.**

*Source:*        *Deposition of Peter Spodick 9/30/2004 at [84:11-[85:25]*

page 84

| | | |
|---|---|---|
| 11 | Q. | Do you recall having conversations with me |
| 12 | | over the course of the weekend, that's Friday, |
| 13 | | Saturday or Sunday? |
| 14 | A. | I recall letting you know that I was going |
| 15 | | to be sending something off as an attempt to |
| 16 | | respond to the judge when he spoke about have you |
| 17 | | made your last best offer. |
| 18 | Q. | So you do recall you and I having telephone |
| 19 | | conversation Sunday afternoon, sometime between 3 |
| 20 | | p.m. and 6 p.m. -- |
| 21 | A. | Can't recall the hour.  If you were to say |
| 22 | | Sunday evening, it would be the same to me.  I do |
| 23 | | recall conversation concerning that what I |
| 24 | | characterize myself as that last best offer. |
| 25 | Q. | And do you recall me asking you have you |

page 85

| | | |
|---|---|---|
| 1 | | prepared your exhibits and you telling me I'm not |
| 2 | | quite done yet, we'll do it tomorrow morning in |
| 3 | | court. |
| 4 | | Do you recall saying that? |
| 5 | A. | No.  My impression was that we were going |
| 6 | | to get together or something or that we would be |
| 7 | | doing this, not that I would on Monday morning.  If |
| 8 | | the word matters, if it doesn't, if it's simply an |
| 9 | | understanding, that's okay. |
| 10 | Q. | Do you recall us having a conversation that |
| 11 | | we're going to exchange exhibits in court Monday |
| 12 | | morning? |
| 13 | A. | Yes. |
| 14 | Q. | Before court? |
| 15 | A. | Yes. |
| 16 | Q. | Meet before court and exchange exhibits? |
| 17 | A. | Yes. |
| 18 | Q. | Because in fact, you were in Southington at |
| 19 | | the time; is that right? |
| 20 | A. | Yes. |
| 21 | Q. | And I was in New Haven and that we were |

| 22 | | going to agree to exchange exhibits prior to the |
|----|----|----|
| 23 | | opening of court Monday morning, May 10th; is that |
| 24 | | correct? |
| 25 | A. | That's correct. |

**21.    From the day this case was brought, Peter Spodick had authority to settle it. At 7:41 p.m. Sunday, May 9, 2004, Attorney Peter Spodick sent to Attorney Bowerman, from the home office of Attorney Sara V. Spodick, via facsimile, offers to settle the case. Each offer expired at 9:00 a.m. Monday, May 10, 2004. The offers were rejected.**

*Sources:*    ***Deposition of Peter Spodick 9/30/2004 at [149:2]-[151:15]***
***Affidavit of Peter Spodick dated August 11, 2004 at ¶¶ 8-11.***
***Declaration of Richard W. Bowerman, Exhibit 1, at ¶ 9***

page 149

| 2 | Q. | Mr. Spodick, showing you Defendant's |
|----|----|----|
| 3 | | Exhibit 7, this is a copy on your letterhead -- |
| 4 | A. | Yes, I recognize it. |
| 5 | Q. | -- of a fax. |
| 6 | | Did you fax that to me on Sunday evening, |
| 7 | | May 9th, at approximately 7:41 p.m.? |
| 8 | A. | What I faxed was a series of documents |
| 9 | | essentially identical to this to each one of the |
| 10 | | defendants presenting, as Judge Underhill had |
| 11 | | spoken of, that last best offer with a dollar |
| 12 | | figure of varying amounts for the different |
| 13 | | defendants to see if they would settle the case. |
| 14 | | This document before me is one page out of the ten. |
| 15 | Q. | So did you fax -- was it your intent to fax |
| 16 | | settlement offers to me as to each defendant on |
| 17 | | Sunday evening, May 9th? |
| 18 | A. | Yes. |
| 19 | Q. | And it was an effort to resolve the case as |
| 20 | | to each defendant; is that correct? |
| 21 | A. | Yes. But with the words of the judge |
| 22 | | specifically from a short time before sort of |
| 23 | | ongoing. |
| 24 | Q. | And Defendant's Exhibit 7 is the fax cover |
| 25 | | sheet, and the next page happens to be one of those |

page 150

| 1 | | offers, and this particular one just happens to be |
|----|----|----|
| 2 | | to Miramax; is that correct? |
| 3 | A. | Yes. |
| 4 | Q. | And it was your intent to make similar -- |

| | | |
|---|---|---|
| 5 | | to make offers of some -- |
| 6 | A. | Varying amounts. |
| 7 | Q. | -- varying amounts to each of the |
| 8 | | defendants; is that correct? |
| 9 | A. | That is correct. |
| 10 | Q. | If Miramax had accepted that offer, would |
| 11 | | Miramax -- would the case have been settled as to |
| 12 | | Miramax? |
| 13 | A. | Sure. |
| 14 | Q. | So Miramax's offer -- acceptance of that |
| 15 | | offer wasn't contingent on others accepting that |
| 16 | | offer, is it? |
| 17 | A. | That's correct. |
| 18 | Q. | And if each of the defendants in turn had |
| 19 | | accepted the settlement offer, the case would have |
| 20 | | been settled for them, correct? |
| 21 | A. | Yes. |
| 22 | Q. | Is there any doubt about that? |
| 23 | A. | No.  If they had accepted, if there had |
| 24 | | been -- just to give the judge the last best offer. |
| 25 | Q. | I understand that. |

page 151

| | | |
|---|---|---|
| 1 | | But it was your intent to make a settlement |
| 2 | | offer to each of the defendants on Sunday, May 9th, |
| 3 | | and had any of the defendants accepted, all of them |
| 4 | | accepted, the case would have been settled, |
| 5 | | correct? |
| 6 | A. | Yes. |
| 7 | Q. | Now, did you have authority to do that? |
| 8 | A. | I believe that I did.  I believe I had |
| 9 | | authority to settle the case at any point over |
| 10 | | these years. |
| 11 | Q. | So had any or each of the defendants |
| 12 | | accepted the respective offer that you made to each |
| 13 | | of them, the case would have been settled as to |
| 14 | | each or all of those defendants; is that correct? |
| 15 | A. | That's correct. |

***Source:***        ***Deposition of Robert Spodick 9/10/2004 [41:24]-42:4]; [42:18]-[42-25].***

| | | |
|---|---|---|
| 24 | Q. | Did you encourage him at all to attempt to |
| 25 | | settle the case prior to May 10th? |

page 42

| | | |
|---|---|---|
| 1 | A. | Prior to that date, I had discussion with |
| 2 | | Peter about effort to negotiate settlement from the |
| 3 | | first day preceding any complaint and constantly |

4            throughout the proceedings.

page 42
18    Q.    Did Peter Spodick have authority to enter
19          into settlement negotiations to resolve those
20          differences?
21    A.    I'm sorry.  Did he what?
22    Q.    Did Peter Spodick have authority to enter
23          into settlement negotiations to resolve those
24          differences?
25    A.    Yes.

**22.    On Monday, May 10, 2004, when Attorney Bowerman met Attorney Spodick shortly after 9:00 a.m. outside Judge Underhill's courtroom to exchange exhibits, he was introduced to Attorney Francis by Attorney Spodick, who had nothing with him but a thin file folder. When Attorney Bowerman asked Attorney Spodick if he was prepared to exchange exhibits, Attorney Spodick stated that he wanted to first speak with his father.**

*Source:*        *Deposition of Peter Spodick 9/30/2004 at [86:13]-[87-1];*
*[121:15]-[121:25]*
*Declaration of Richard W. Bowerman, Exhibit 1, at ¶ 13.*

page 86
13    Q.    Do you recall you and me having a
14          conference outside the courthouse with Mr.
15          Underhill -- Judge Underhill?
16    A.    I remember passing in the hallway
17          something.
18    Q.    You don't recall your introducing me to
19          Mr. Francis?
20    A.    I recall that generally, but not in the
21          most specific sense as you phrased it.
22    Q.    And do you recall saying that you were not
23          going to exchange exhibits, you wanted to wait to
24          talk to your father?
25    A.    Until he got there, yes.
page 87
1    Q.    You recall that?
2    A.    Yes.

Page 121
15          Had you brought any documents into the
16          United States Federal Courthouse that morning?
17          No.
18          Did you have a briefcase with you that

| 19 | | morning? |
| 20 | A. | I think I was carrying a folder of things, |
| 21 | | not a briefcase. |
| 22 | Q. | And was that folder the only documents that |
| 23 | | you had with you as you went to the courthouse |
| 24 | | that morning? |
| 25 | A. | Yes. |

**23.    On May 10, 2004, Attorney Spodick drove to court with Attorney Francis. Attorney Spodick anticipated that Robert Spodick would not be ready to be an appropriate witness.**

*Source:*        *Deposition of Peter Spodick 9/30/2004 at [91:7]-[92:2]*

page 91

| 7 | Q. | What was the first thing that you |
| 8 | | anticipated was going to happen in court that day |
| 9 | | as you drove to court? |
| 10 | A. | Can you ask that question again?  That's |
| 11 | | not clear to me. |
| 12 | Q. | You're driving to court on May 10, 2004? |
| 13 | A. | Yes. |
| 14 | Q. | You're having some discussion about your |
| 15 | | father's health, okay.  Let's say dad's health is |
| 16 | | great, you think he's just looking great.  He's |
| 17 | | okay.  He doesn't have pneumonia.  He's in as good |
| 18 | | a health he could be for his age and his condition. |
| 19 | | What did you expect was going to happen? |
| 20 | A. | I didn't expect him to be in good health or |
| 21 | | in great shape or whatever his medical history had |
| 22 | | been recently in any positive way at all.  I |
| 23 | | anticipated him being -- I anticipated him being |
| 24 | | weak and not ready to be an appropriate witness. |
| 25 | | I expected him to be the way I've perceived |

page 92

| 1 | | him, as I put it, just willing to sacrifice |
| 2 | | anything for this suit. |

24.    On their way to the courthouse on May 10, 2004, and while waiting for
Robert Spodick to arrive, Attorney Spodick and Attorney Francis discussed
withdrawing the case.

*Source:*         *Deposition of Peter Spodick 9/30/2004 at [123:6]-[123:17];*
                  *[124:25]-[125-17].*

page 123

| | | |
|---|---|---|
| 6 | Q. | When you got to court, what did you |
| 7 | | observe? |
| 8 | A. | In arriving at the courthouse? |
| 9 | Q. | Correct.  Your best recollection is you |
| 10 | | arrived when? |
| 11 | A. | I think it was about 9 o'clock or something |
| 12 | | like that. |
| 13 | Q. | Did you and Mr. Francis walk in together? |
| 14 | A. | Yes. |
| 15 | Q. | Did you go directly to Judge Underhill's |
| 16 | | courtroom? |
| 17 | A. | I believe so. |

Page 124

| | | |
|---|---|---|
| 25 | Q. | Did you speak with Mr. Francis at all about |

page 125

| | | |
|---|---|---|
| 1 | | withdrawing the case at that time? |
| 2 | A. | I said to him my father is late.  I don't |
| 3 | | like the look of this, I don't like the feel of |
| 4 | | this.  I spoke with him, yes. |
| 5 | Q. | And did he agree with your observations? |
| 6 | A. | Yes, he did. |
| 7 | Q. | What did he say? |
| 8 | A. | I had spoken with him in the car coming |
| 9 | | down and in the courthouse about my fears for my |
| 10 | | father, that I did not feel well at all about |
| 11 | | putting him through this process. |
| 12 | | Charles has known the family and my father |
| 13 | | for many years, and I used my conversational |
| 14 | | language about I don't want my father dying for the |
| 15 | | York Square, and he said, see how Bob looks when he |
| 16 | | gets here, if he gets here, because there was a |
| 17 | | long wait and dad was not there. |

25.    On May 10, 2004, when Robert Spodick got off the courthouse elevator on the fourth floor, Attorney Spodick and Attorney Francis had a conversation with Robert Spodick outside Judge Underhill's courtroom. The first thing Attorney Spodick said was "Dad, I don't think that we can do this." Attorneys Spodick, Francis and Robert Spodick then conversed. Robert Spodick stated that he felt great. Attorney Francis spoke with Robert Spodick and suggested that withdrawing the case "was the right thing to do."

*Source:*      *Deposition of Peter Spodick 9/30/2004 at [126:18]-[127:19]*
          *Letter dated May 14, 2004 from Robert Spodick to Judge Underhill –*
          *Exhibit 5.*

page 126
18  Q.    The conversation that you had with your
19         father in the hallway, did you have to speak
20         loudly?
21  A.    You always have to speak loudly with him.
22  Q.    And there were other people in the hallway;
23         isn't that true?
24  A.    Yes.
25  Q.    Were you aware that other people were
page 127
1          overhearing the conversation?
2   A.    I don't know.  Maybe.  I don't know.  It's
3          not an issue for me.
4   Q.    What did you say to your father?
5   A.    I said to him, "Dad, I don't think that we
6          can do this."  I said to him at some point -- and
7          it was very brief.  I said, "I can't put you
8          through this.  This should be ended right now."
9   Q.    And what did your father say to you?
10  A.    He did not want to end this.
11  Q.    What did he say to you?
12  A.    He said, "I feel great."
13         I'm looking at Charles and --
14  Q.    Did Mr. Francis say anything?
15  A.    He spoke somewhat to dad.  I can't recall.
16  Q.    Did Mr. Francis suggest that withdrawing
17         the case was the right thing to do?
18         Did he suggest that to your father?
19  A.    Yes, he did.  Yes, he did.

*Source:*      *Deposition of Robert Spodick 9/10/2004 [55:8]-[55-15]; [59:8]-[59:25].*

Page 55

| 8  | Q. | When you got off the elevator, what did you |
|----|----|---------------------------------------------|
| 9  |    | do? |
| 10 | A. | I said good morning to my counsel. |
| 11 | Q. | And what did he say to you? |
| 12 | A. | He said that he was very frightened of the |
| 13 |    | case, very fearful that he couldn't go on before |
| 14 |    | the court. I tried to reassure him, and I suddenly |
| 15 |    | found that he was serious. |

Page 59

| 8  | Q. | How did you feel about going to court? |
|----|----|----------------------------------------|
| 9  | A. | Excited. |
| 10 | Q. | Were you distraught about the idea of being |
| 11 |    | a witness? |
| 12 | A. | No. |
| 13 | Q. | Were you tired when you walked into court |
| 14 |    | that day? |
| 15 | A. | No. |
| 16 | Q. | And did you appear confident as you walked |
| 17 |    | in the court, at least in your view? |
| 18 | A. | I don't know how I appeared. That's for |
| 19 |    | others. |
| 20 | Q. | How did you feel? |
| 21 | A. | Fine. |
| 22 | Q. | Did you feel distraught? |
| 23 | A. | No. I felt worried. |
| 24 | Q. | Were you weak? |
| 25 | A. | No. |

**26.    Robert Spodick knew prior to walking into Judge Underhill's courtroom that the case was going to be withdrawn. He was informed that Attorney Spodick was going to withdraw the case, not withdraw as counsel.**

*Source:*    ***Deposition of Peter Spodick 9/30/2004 at [128:20]-[129:15]; [139:10]-139:15]; [141:4][141:10].***

page 128

| 20 | Q. | Did you have a discussion with your father |
|----|----|--------------------------------------------|
| 21 |    | as to why you were going to withdraw the case? |
| 22 | A. | Very brief. |
| 23 | Q. | And what was that discussion? |
| 24 | A. | These kinds of things. I wonder if he even |
| 25 |    | hears me and you can't shout all the time with him |

page 129

| 1 | | but the nature of things. I think that it's |
|---|--|---------------------------------------------|

```
2              exactly what I've said already, the same testimony,
3              these same things.  It was very, very brief.  I
4              said finally I think this has to be ended.  I said
5              I'm going to withdraw the case.
6     Q.       And did you tell that to them as you stood
7              outside Judge Underhill's courtroom?
8     A.       Outside, or maybe as we were walking in.  I
9              can't recall literally where I was.  In the flow in
10             that immediate context, yes, and it was to the two
11             of them.  It was -- the three of us were standing
12             there together.
13    Q.       The three of you were standing outside
14             Judge Underhill's courtroom, correct?
15    A.       Yes.
```

page 139

```
10    Q.       Did your father protest to you on May 10th
11             outside Judge Underhill's courtroom, your
12             conclusion that he wasn't in good enough health to
13             proceed?
14    A.       Before going into the courtroom, yes.  On
15             the way out, no.
```

page 141

```
4     Q.       Did you tell your father you were going to
5              withdraw as counsel?
6     A.       No.  I said I was going to withdraw the
7              case.  It wasn't a matter of me getting out.  No, I
8              did not say that -- anything like that.  I haven't
9              seen his transcript.  I don't know what he has said
10             but I didn't say anything like that.
```

**27.    While in Judge Underhill's courtroom, and prior to Attorney Spodick addressing the court, Robert Spodick stated to Attorney Spodick, "Do what you must."**

*Source:*    ***Declarations of Richard W. Bowerman (Ex. 1); Vicki R. Solmon (Ex. 2), Constance Minnett (Ex. 3); Andrew Chang (Ex. 4) and Jeffrey Rosen (Ex. 5).***

28.    Robert Spodick stood next to Attorney Spodick and could hear what Attorney Spodick said when Attorney Spodick voluntarily withdrew the case with prejudice on May 10, 2004.

*Source:*        *Deposition of Robert Spodick 9/10/2004 at [66:6]-[67:5].*

page 66

| 6 | Q. | You saw Peter Spodick get up, stand up, |
| 7 |    | correct? |
| 8 | A. | I stood up with him. |
| 9 | Q. | So you were standing next to Peter Spodick |
| 10 |    | and Peter Spodick was addressing the court, |
| 11 |    | correct? |
| 12 | A. | Yes. |
| 13 | Q. | Peter Spodick said some words, correct? |
| 14 | A. | Yes. |
| 15 | Q. | And as I understand your testimony, you |
| 16 |    | can't recall the exact words he spoke today, |
| 17 |    | correct? |
| 18 | A. | Yes. |
| 19 | Q. | Do you recall hearing him speak?  You were |
| 20 |    | aware he was speaking, correct?  Is that correct? |
| 21 | A. | Yes. |
| 22 | Q. | And could you hear him speak? |
| 23 | A. | Yes. |
| 24 | Q. | And if you couldn't have heard him speak |
| 25 |    | knowing that he was speaking, you would have told |

page 67

| 1 |    | him to speak up, wouldn't you? |
| 2 | A. | I probably would, yes. |
| 3 | Q. | Whatever hearing impairment you have, Peter |
| 4 |    | Spodick was aware of it, was he not? |
| 5 | A. | Yes. |

29.    Having failed to settle the case prior to the opening of court on May 10, 2004, Attorney Spodick, knowing that his designated expert Ronald Wanless was not going to testify, knowing that Peter Spodick, the operator and manager of the York Square since 1997, was not going to testify, knowing that his damages witness might not "be able to testify," and knowing that Robert Spodick was not ready "to be an appropriate witness," discussed withdrawing the case with Robert Spodick and Attorney Francis outside Judge Underhill's courtroom on May 10, 2004 and then went into court and proceeded to withdraw the case with prejudice. The withdrawal proceeded in the presence of Robert Spodick, an officer, director and owner of the plaintiff, who voiced no objection as the motion to withdraw was made, the Court

confirmed that the case was being dismissed with prejudice, and the Court stated that the case was over.

*Sources:*    *Deposition testimony of Robert and Peter Spodick cited above*
            *Transcript of Court proceedings before Judge Underhill, May 10, 2004 –*
            *Exhibit 6.*

30.    Over the course of the weekend of May 7th, the defendants had made arrangements to have Judge Underhill's courtroom set up with monitors, projectors and a screen and had flown a technician in from the west coast to assist the defendants in presenting their cases. The cost incurred by the defendants to do so exceeded $6,700.00  Additionally, seven representatives of respective defendants had flown from Los Angeles over the weekend to Connecticut to assist in preparing for trial and to attend trial, and two representatives had traveled the morning of May 10, 2004, to Connecticut from New York  for that purpose. Significant attorneys fees and expenses were incurred by the defendants from May 6, 2004, the day of the pretrial conference to and including May 10, 2004, all of which amount to tens of thousands of dollars expended in those four days alone.  Had Attorney Spodick not voluntarily withdrawn the case with prejudice in the presence of an officer and owner of the plaintiff, the defendants were prepared to, and would have, proceeded to trial on the morning of May 10, 2004, as ordered by the Court.

*Source:*    *Declaration of Richard W. Bowerman ( Exhibit 1) at ¶ 15, 16.*

31.    On May 14, 2004. Robert C. Spodick wrote a letter to the Court, stating: "I was stunned by my counsel, my son, Peter Spodick, when he told me at the door to the Court that he could not carry on with the case. A brief conversation was unavailing. After all these years of preparation, Peter stood before you and withdrew. At his side, I stood speechless."

*Source:*    *May 14, 2004 letter from Robert C. Spodick to Judge Stefan Underhill –*
            *Exhibit 5.*